**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THEODORE HENDERSON, on behalf of himself and those similarly situated, ) ) ) | Case No. 09 CIV 7328 (DLC) |
| Plaintiff, ) | |
| - *against* - ) | |
| THE TRANSPORTATION GROUP, LTD., and JOSEPH STEVERT, ) ) | |
| Defendants. ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
(212) 701-3000

*Attorneys for Defendants The Transportation Group, Ltd. and Joseph Steuert*

Of Counsel:

David G. Januszewski
Lauren Perlgut

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 2

    I.   The Role of Financial Analysts ................................................................ 4

    II.  Mr. Henderson's Responsibilities ........................................................... 5

        A.  Generally ........................................................................................ 5

        B.  Investor Calls and Debt Marketing ............................................... 6

        C.  Other Assignments ......................................................................... 8

    III. Mr. Henderson's Training Assignments .................................................. 9

    IV. The Termination of Mr. Henderson's Employment ................................ 11

LEGAL STANDARD ........................................................................................... 12

ARGUMENT ........................................................................................................ 12

    I.   Salary Basis Requirement ...................................................................... 13

    II.  Performance of Office Work Directly Related to General Business Operations ........ 13

    III. Exercise of Discretion and Independent Judgment ................................. 16

        A.  Financial Analysts Exercised Discretion in Strategic and Debt Marketing Work ........ 17

        B.  Performance of Some Clerical Work Does Not Forfeit the Exemption ........ 20

        C.  The Fact of Supervision Does Not Forfeit the Exemption ............. 21

        D.  Mr. Henderson's  Inability to Perform Certain Job Duties Does Not Render Him Non-Exempt ........ 22

    IV. The Regulations' Example of Qualifying Financial Employees Corresponds to the Work Performed by Financial Analysts at TTG ........ 24

    V.  The Analysis is Identical Under New York Law ..................................... 24

CONCLUSION ..................................................................................................... 25

<u>**TABLE OF AUTHORITIES**</u>

<u>Page</u>

<u>Cases</u>

*Amendola* v. *Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459 (S.D.N.Y. June 4, 2008) ..................................................................................... 16, 18-19, 21

*Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...................................... 12

*Celotex Corp.* v. *Catrett*, 477 U.S. 317 (1986)................................................. 12

*Davis* v. *J.P. Morgan Chase & Co.*, 587 F.3d 529 (2d Cir. 2009)...................... 14-15

*Franklin* v. *Breton International, Inc.*, 06 Cir. 4877 (DLC), 2006 U.S. Dist. LEXIS 88893 (S.D.N.Y. Dec. 11, 2006) ............................................... 25

*Martin* v. *Cooper Electric Supply Co.*, 940 F.2d 896 (3d Cir. 1991) ................ 15n

*In re Novartis Wage and Hour Litigation*, 593 F. Supp. 2d 637 (S.D.N.Y. 2009)............................................................................................ 18

*Reich* v. *John Alden Life Insurance Co.*, 126 F.3d 1 (1st Cir. 1997)................... 15, 19

*Reiseck* v. *Universal Communications of Miami, Inc.*, 591 F.3d 101 (2d Cir. 2010) ..................................................................................................... 15n, 22n, 23

*Reiseck* v. *Universal Communications*, 06 Civ. 0777 (TPG), 2009 U.S. Dist. LEXIS 26013 (S.D.N.Y. Mar. 25, 2009)............................................... 23

*Schaefer-LaRose* v. *Eli Lilly and Co.*, 663 F. Supp. 2d 674 (S.D. Ind. 2009) ....................................................................................................... 18-19

*Zalewski* v. *PNC Financial Services Group*, 555 F. Supp. 2d 555 (W.D. Pa. 2008)....................................................................................................... 20

<u>Regulations</u>

Labor Regulations

| | |
|---|---|
| 29 C.F.R. § 541.2 (2010)............................................................... | 22 |
| 29 C.F.R. § 541.200 (2010)........................................................... | 13-14, 16 |
| 29 C.F.R. § 541.201 (2010)........................................................... | 14 |
| 29 C.F.R. § 541.202 (2010)........................................................... | 16-18, 21 |
| 29 C.F.R. § 541.203 (2010)........................................................... | 14, 24 |
| 29 C.F.R. § 541.602(a) (2010)........................................................ | 13 |
| 29 C.F.R. § 541.700 (2010)........................................................... | 20-21 |

Page

N.Y. Labor Regulations

    12 NYCRR § 142-2.2 (2010) ........................................................ 12
    12 NYCRR § 142-2.14 (2010) ..................................................... 12, 24-5

Rules

Fed. R. Civ. P.

    56............................................................................................... 12
    56(b) ......................................................................................... 1
    56(c) ......................................................................................... 12

Statutes

Fair Labor Standards Act

    29 U.S.C. §§ 201-219 (2006), as amended ................................. 1-2, 12
    29 U.S.C. § 207............................................................................ 12
    29 U.S.C. § 213............................................................................ 12

Other Authorities

Applicability of Exemption for Administrative Employees to Medical
    Detailist, [1943-48 Wages-Hours] Lab. L. Rep. (CCH) ¶ 33,093
    (May 19, 1945) ............................................................................ 19

Department of Labor, Wage and Hour Division, Defining and
    Delimiting the Exemptions for Executive Administrative,
    Professional, Outside Sales and Computer Employees, 69 Fed. Reg.      12-13, 16-18,
    22122 (Final Rule Apr. 23, 2004)................................................. 22

Defendants The Transportation Group, Ltd. and Joseph Steuert (collectively, "Defendants") respectfully submit this Memorandum of Law in support of their Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(b).

## <u>INTRODUCTION</u>

Plaintiff Theodore Henderson, a white-collar investment banker, brings this action seeking overtime payment compensation in connection with his work for The Transportation Group (Capital) Limited ("TTG"), a boutique investment bank where he worked as a financial analyst ("Financial Analyst") for just seven weeks in early 2009. Mr. Henderson was laid off while still in the process of learning the sophisticated financial modeling and financial statement analysis that the position for which he was hired required. The bulk of his time was spent performing debt marketing work, consisting of reaching out to potential investors to attract financing for the deals his team was working on.

Mr. Henderson was not paid by the hour, but received an annual salary well above the minimum wage. When he was hired, it was anticipated that he would be relocated to TTG's London office, and receive at that time a substantial Cost of Living Adjustment as well.

Because the Financial Analyst position at TTG met both the applicable salary and both duty requirements, TTG characterized its Financial Analysts as administrative employees exempt from the overtime payment requirements of the Fair Labor Standards Act ("FLSA") and New York Labor Law. The fact that (by his own admission) Mr. Henderson was struggling to complete the duties of a Financial Analyst in his first weeks of employment does not render him non-exempt in contrast to his peers, and the work that he did perform also falls directly within the exemption.

On December 10, 2009, this Court ordered the Parties to engage in limited discovery focused on the issue of whether Mr. Henderson's primary responsibilities included the "exercise of independent judgment and discretion," as required under the third prong of FLSA's test for exempt administrative employees. Defendants thereafter produced more than 700 documents, which largely consist of e-mails written and received by Mr. Henderson and the attachments thereto. On February 12, 2010, Defendants conducted the deposition of Mr. Henderson.

Now, after the close of discovery, there remains no genuine issue of material fact as to the duties of Mr. Henderson as a Financial Analyst. His sworn testimony[1], e-mails and work product, and the affidavits of his supervisors[2] demonstrate that Mr. Henderson and his peer Financial Analysts exercised independent judgment and discretion in the performance of the very responsibilities that Mr. Henderson was performing and learning to perform.

## STATEMENT OF FACTS

As set forth in Defendants' Statement of Uncontested Facts Pursuant to Rule 56.1 ("SUF") paragraphs 1 through 6, Plaintiff Theodore Henderson was employed by the Transportation Group (Capital) Limited ("TTG"), a boutique investment bank, as a Financial Analyst. (Perlgut Decl. Ex. 1.) Mr. Henderson was hired on January 29, 2009, with his employment beginning on February 2, 2009. *Id.* After a transition period in TTG's New York office, he was to

---

[1] The transcript of the deposition of Theodore Henderson, conducted on February 12, 2010 is attached as Exhibit 3 to the Declaration of Lauren Perlgut ("Perlgut Decl.") submitted in support of Defendants' motion.

[2] *See* the Affidavit of Charles Kolber, Managing Director of TTG, dated Feb. 25. 2010 ("Kolber Aff."); the Affidavit of Joseph J. Steuert, Chairman and CEO of TTG, dated March 1, 2010 ("Steuert Aff."); and the Affidavit of Thomas Vanlangen, formerly a Vice-President at TTG, dated March 1, 2010 ("Vanlangen Aff.") submitted in connection with Defendants' motion.

be relocated to TTG's London office. *Id*. He was hired at an annual salary of $35,000, with the addition of a Cost of Living Adjustment of $8,750 per annum upon transferring to the London office. *Id*. TTG also agreed to pay for the cost of the flight to London. *Id*. Mr. Henderson was also given a generous benefits package, including ten vacation days, twelve sick days and two personal days annually. *Id*.

During the time Mr. Henderson was employed, TTG was a boutique investment bank "focused on providing investment offerings, investment research and arrangement and advisory services related to the aviation and rail transport industries, from its-full service offices located in New York, London and Hong Kong." (Perlgut Decl. Ex. 2; SUF ¶¶ 7-8.) TTG specialized in "the arrangement and placement of fixed income, equity and lease financing with a broad range of European, North American and Asian institutional investors, on behalf of aviation and rail clients based around the world." *Id*. Put simply, TTG "arranges the financing of transportation equipment by bringing together investors/lenders with corporations that require financing." (Kolber Aff. ¶ 4.) The specific tasks associated with arranging a financing transaction include "(1) identifying companies that need to finance or refinance their equipment; (2) making a proposal tailored to the needs of these corporations; (3) presenting the transaction to financing sources including investors and lenders; (4) as necessary, restructuring the proposed pricing to respond to or better capture investor interest; (5) structuring a transaction and preparing term sheets to be signed by all of the participants; and (6) documenting and closing the transaction." (Kolbert Aff. ¶ 5; Steuert Aff. ¶ 7; SUF ¶ 9) Each deal was supervised by a Vice-President and staffed with Associates and Financial Analysts (also known as Analysts) assigned to the deal. (Kolber Aff. ¶ 7; SUF ¶ 13.)

# I.    The Role of Financial Analysts

Mr. Henderson was one of roughly six Financial Analysts in TTG's New York office. (Henderson Tr. 34:24-35:2; Steuert Aff. ¶ 9; SUF ¶ 14). The primary role of Financial Analysts was to support their team in developing the terms of a deal, marketing the deal to potential investors and closing the deal. (Kolber Aff. ¶ 8; SUF ¶ 16.) Mr. Henderson characterized the responsibilities of the typical Financial Analyst as:

> They would be there supporting the VPs and the associates in doing the things that I was doing, the basic stuff like fixing the grammar errors and printing out copies. Then they would also be helping on the phone calls I was doing. But since they had more training they would be helping more with the actual loan pricing. So they might have a couple of call-ins of it that they were responsible for getting done. (Henderson Tr. 71:24-72:8.)

The minimum requirements for a Financial Analyst candidate included a Bachelor's Degree from a four year college, "excellent analytical skills and quantitative experience," and "familiarity with Excel Spreadsheet and word document application programs." (Perlgut Decl. Ex. 4; Kolber Aff. ¶ 28; SUF ¶ 25.) Financial Analysts were also required to obtain a Series 7 License. (Kolber Aff. ¶ 23; SUF ¶ 25.) TTG sought candidates who were quick learners to "move quickly through training and take on increasing ownership and responsibility of the tasks assigned to them." (Kolber Aff. ¶ 28.)

**Deal proposals**. One of the first steps in securing a transaction for TTG was to prepare a successful proposal for the client interested in seeking financing. (Kolbert Aff. ¶ 5; Steuert Aff. ¶ 7.) Financial Analysts were responsible for maintaining relations with potential investors both to market current deal proposals and to facilitate future deals. (Steuert Aff. ¶ 8; SUF ¶ 18.) Financial Analysts were expected to advise their teams how the proposals for new deals should be structured or current deals restructured to best capture the interest of their contacts based on these calls. (Steuert Aff. ¶ 8; SUF ¶ 20.)

**Debt marketing**.  Vice-Presidents, Associates and Financial Analysts all made phone calls to their existing investor contacts and potential new investors to market the deals they worked on.  (Kolber Aff. ¶ 9; SUF ¶ 19.)  As more fully set forth in the Affidavit of Charles Kolber, Financial Analysts were expected to explain TTG's pending deals and answer investor questions.  *Id.*  One part of the process was sending debt marketing e-mails, which contained summaries of the terms and conditions of the proposed loan.  (*See* Perlgut Decl. Ex. 5 (Draft debt marketing e-mail sent from Mr. Henderson to his supervisor); Kolber Aff. ¶ 11; SUF ¶ 21.)

**Modeling work**.  Financial Analysts also helped their team put together "pricing files" for their deal transactions, which consisted of a "sophisticated Excel spreadsheet consisting of workbooks that are linked together  to provide a Summary Sheet that details the variables (input) that have been used to determined the proposed economics."  (Kolber Aff. ¶ 15;  *See also* Henderson Tr. 18:10-16; Perlgut Decl. Ex. 6 (Attachment is example of a pricing file); SUF ¶ 22.)  Former Vice-President Thomas Vanlangen explained that a background in finance is necessary to perform these sophisticated calculations; there is much more involved than simply plugging in numbers.  (Vanlangen Aff. ¶ 11.)

**Writing term sheets**.  Each deal required separate term sheets as applicable for the lenders, the lessees and the equity investors.  (Kolber Aff. ¶¶ 17-19; SUF ¶ 23.)  Financial Analysts also assisted in putting together term sheets for the deals they worked on, or updating the term sheets to reflect terms discussed in calls with clients.  *Id.*

## II.    Mr. Henderson's Responsibilities

### A.    Generally

On Mr. Henderson's own resumé, prepared after he left TTG, he characterized his position at TTG as:

"Pricing asset-backed loan schedules and structuring the acquisition or refinancing of commercial aircraft for the boutique investment bank. Automating generation of transaction models and marketing material using VBA. Performing debt marketing support." (Perlgut Decl. Ex. 7.)

At his deposition, Mr. Henderson qualified these descriptions of his responsibilities, saying that he was actually in the process of *learning* to complete these tasks while at TTG:

"Q. Let's turn back to your resumé, Exhibit 1. I would like to walk through how you described your work at TTG under professional experience. So the first thing says "Pricing asset-backed loan schedules." What did that entail?

A. This isn't really entirely relevant to what I was doing there.

Q. So you were not involved in pricing asset-backed loan schedules?

A. I was in the being taught to do it phase pretty much the whole time, we didn't really have many teaching sessions.

Q. Were other analysts involved in pricing asset-backed loan schedules?

A. Some of the ones who had been there longer were doing more, but myself and actually the other guy that was hired with me, actually he was there even less."

(Henderson Tr. 17:11-18:5; Perlgut Decl. Ex. 8.)

He instead attempted to minimize his responsibilities as "Probably my main responsibilities were editing Word documents that were marketing materials, like looking for typos or formatting errors. Doing debt marketing calls off of sort of like a script to random people who were like in their business or might possibly be in their business, and like attending group meetings; I would say those were the main ones." (Henderson Tr. 22:16-25.) Mr. Henderson also clarified, however, that "I was doing the other work because I didn't receive the training." (Henderson Tr. 25:5-12.)

B.   **Investor Calls and Debt Marketing**

As Mr. Henderson testified, he was on the marketing team at TTG and his responsibilities were thus focused on marketing work, which included making debt marketing calls to

potential investors. (Henderson Tr. 16:21-17:10; Perlgut Decl. Ex. 9 (E-mail stating that Mr. Henderson was responsible for 85 investor contacts); SUF ¶ 27.) The purpose of such calls was to determine the investment strategy of the people he called and to market and discuss the TTG deals that Mr. Henderson was working on. (Henderson Tr. 45:8-13; SUF ¶ 27.) Mr. Henderson testified that he spent more time on this task than any other work-related task, and that roughly half of his overall time spent working was devoted to making these calls. (Henderson Tr. 60:9-25; SUF ¶ 34.)

While Mr. Henderson initially claimed in his deposition that he had been given a "script" for such calls, he later admitted that nobody with supervisory authority gave him such a script, and that, beyond the financial terms of the proposed deal, he would plan and write the calls and e-mails himself:

Q. Were you told what to say outside of information relating to the loan?

A. No, otherwise just wing it.

*     *     *     *

Q. This first page, this is an e-mail from you to a Mr. Gleysteen, is that correct?

A. Yes.

Q. Did you write this e-mail yourself?

A. Yes.

*     *     *     *

Q. Did anyone with supervisory authority over you give you a call script?

A. Not really. Tom [Vanlangen] kind of went over it generally with me, but he was like here you go.

(Henderson Tr. 45:19-21; 54:15-19; 86:12-16; Perlgut Decl. Ex. 10; SUF ¶ 31-32.)[3] Mr. Henderson also testified that he developed his own sales pitch. (Henderson Tr. 53:11-13; SUF ¶ 31.)

Mr. Henderson testified that he had also been involved in searching for potential clients on the Internet and thus helped research and choose which clients to call:

Q. How did you choose which potential clients or contacts should go on the list?

A. Most of it was just guesswork. Like most of these people that we called we don't really know if they were doing it. So we were trying to find people who were in loan financing, so we would Google loan financing, things like that, or look for some kind of consortium and call them up.

(Henderson Tr.47:6-14; Perlgut Decl. Ex. 11; SUF ¶ 28.)

In fact, reviewing his own allegations from the Amended Complaint (which he testified he had only read in part), Mr. Henderson retracted from the allegation that he "had no discretion as to which clients he called, what he said to them, what information he had to give them." (Amend. Compl. ¶ 26; Henderson Tr. 64:7-9.) Mr. Henderson admitted that instead he "could wing the words and express personality; and as far as the discretion for the clients, I thought I was able to find clients to add to the list, but I think this is more or less accurate." (Henderson Tr. 64:21-25.)

C. **Other Assignments**

Henderson was also given a few financial modeling assignments, though he was unable to complete at least one of them. (SUF ¶ 37.) On that occasion, Mr. Henderson, along

---

[3] Thomas Vanlangen agreed that there was no formal call script, but that Financial Analysts could be given bullet points with information describing the deal they were marketing. (Vanlangen Aff. ¶ 10; SUF ¶ 32.)

with the entire New York team, including Vice-Presidents, Associates and Analysts, was asked to produce pricing models for a number of aircrafts.  (Perlgut Decl. Ex. 6.)  As Mr. Henderson explained, "Each number represented an aircraft, and they were supposed to work on the alternative pricing for the aircraft that they were assigned."  (Henderson Tr. 56:15-25.)  He testified, however, "I remember I wasn't able to do my part."  *Id.*  Ten days later (within his last few days of employment at TTG), however, he did send a draft lease file to his supervisor for review.  (Perlgut Decl. Ex. 12.)

Mr. Henderson was also free to propose his own projects and received approval to work on some of them.  (Henderson Tr. 53:7-10; SUF ¶ 35.)  For one such project, Mr. Henderson attempted to use Visual Basic Application to automate TTG's debt marketing material and transaction models.  (Perlgut Decl. Ex. 7; Henderson Tr.: 19:21-21:13; SUF ¶ 36.)

## III.    Mr. Henderson's Training Assignments

As he testified, Mr. Henderson was laid off from TTG while he was still learning how to complete many of the tasks associated with the job for which he was hired. (Henderson Tr. 17:20-18:5; SUF ¶38.)  While Mr. Henderson was expected to begin taking on responsibilities of a Financial Analyst from his first day, he did receive training to enable him to perform the duties at the same level as his peers.  (Henderson Tr.: 23:11-25, 60:4-8; SUF ¶¶ 39-40, 44.)  The "overall goal of the training sessions," Mr. Henderson testified, was to "acquaint us with these asset-backed loan schedules and the different deals that they worked on, and how to make the models or how to manipulate the models."  (Henderson Tr. 24:18-23; SUF ¶ 40.)

Mr. Henderson testified repeatedly that he was unable to complete some of the duties of a Financial Analyst because he did not have sufficient background knowledge or training.  (SUF ¶ 43.)  For example: "one of the senior people there, Lisa Chang who is VP, she

started to tell us about the models and how to do the financial equations that they used or the financial calculator that they used. I don't know to use the [financial] calculator. So she would start going over the material, she told us some of the basic parts, I don't think we ever got to a real model." (Henderson Tr. 23:11:-24:3.) Reviewing an e-mail that had gone to a client, Mr. Henderson testified, "This is the real thing. I never got to this level." (Henderson Tr. 55:11-14.) And discussing a "teach-in" held by a Vice-President to acquaint the entire staff with a new deal TTG sought to market, Mr. Henderson explained, "I think this was supposed to help them go over some of the intricacies of things that they would need to change in the Excel. Like I said, it was kind of beyond me." (Henderson Tr. 31:2-10; Perlgut Decl. Ex. 13.) (*See also* Henderson Tr. 57:22 - 58:1) ("Q. Do you know why you were cc'd on this document? A. Because I was a part of the team and the hope was that some day I would be able to help.")

Mr. Henderson testified about several of the "homework" assignments he had been given at TTG. Because he lacked the background knowledge, Mr. Henderson required training on the most fundamental financial concepts, as reflected in the homework given to him on February 6, 2009, during his first week of employment:

> Q. How did this homework assignment relate to your job responsibilities?
>
> A. This is like the most basic part of the structure of the loan models that they would use, so like at a very rudimentary level.
>
> Q. So this was teaching you how to structure loan models, is that correct?
>
> A. No, this is I guess teaching us like how to do a level of debt service, like what these fixed income things mean. It wasn't really, I want to make sure I say it right. It was part of teaching us how to structure, this was sort of teaching us more what the foundation of it is; it was like the basic concept.

(Henderson Tr. 27:8-21; Perlgut Decl. Ex. 14; SUF ¶ 41.) Discussing a subsequent homework assignment he received the following week, Mr. Henderson explained: "This would have been

getting closer to what the real loan schedule assignments would entail." (Perlgut Decl. Ex. 15; Henderson Tr. 29:2-6.)

Moreover, Mr. Henderson several times expressed that even the *homework* was too difficult for him:

Q.   Do you recall working on this assignment?

A.    I remember starting it, I don't remember finishing it though. I remember that we needed help on like all the parts.

*       *       *       *

Q.   What were you taught at the teach-in?

A.    It was kind of beyond me at that stage. It was for a really complicated structuring that they were working on, that both teams were.

(Henderson Tr. 29:11-15; 30:5-10; SUF ¶ 42.)

## IV.   The Termination of Mr. Henderson's Employment

The historic, unprecedented economic and financial crisis severely impacted TTG's core business. In March and April 2009, TTG faced a severe shortage of work and was forced to lay off 70% of its staff over the ensuing months. (Steuert Aff. ¶¶ 11-13.) Mr. Henderson was one of the employees laid off, effective March 23, 2009. (SUF ¶¶ 45-46.)

Mr. Henderson testified that the weeks leading up to his termination were "slow": "It was slow in the sense that there wasn't actually stuff to do. During the business hours it was like there would be nothing going on, you would just come up with your own stuff, come up with your own things to do." (Henderson Tr. 15:7-12; SUF ¶ 47.) He also testified that he spent much of this time reading the newspaper online or trying to "look like [he was] doing stuff." (Henderson Tr. 15:13-16:3; SUF ¶ 47.)

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered" in favor of a moving party where "there is no genuine issue as to any material fact and [] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under governing law." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986).

## ARGUMENT

Under the Fair Labor Standards Act, 29 U.S.C. §§ 201-219, and New York Labor Law, employers must compensate employees at 1.5 times compensation rate for hours worked in excess of 40 hours per week. 29 U.S.C. § 207; 12 N.Y.C.R.R. § 142-2.2. Employees "employed in a bona fide executive, administrative, or professional capacity," however, are exempt from this requirement. 29 U.S.C. § 213; *See also* 12 N.Y.C.R.R. § 142-2.14. The Department of Labor explained the rationale behind these exemptions, which are intended to exclude workers receiving generous salaries and benefits whose jobs could not be easily subdivided or spread to other workers:

> The legislative history [of the FLSA] indicates that the section 213(a)(1) exemptions were premised on the belief that the workers exempted typically earned salaries well above the minimum wage, and they were presumed to enjoy other compensatory privileges such as above average fringe benefits and better opportunities for advancement, setting them apart from the nonexempt workers entitled to overtime pay. Further, the type of work they performed was difficult to standardize to any time frame and could not be easily spread to other workers after 40 hours in a week, making compliance with the overtime provisions difficult and generally preclud-

ing the potential job expansion intended by the FLSA's time-and-a-half overtime premium.

Department of Labor, Wage and Hour Division, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; 69 Fed. Reg. 22122, 22123-24 (Final Rule, Apr. 23, 2004).

In order to be considered an exempt administrative employee under FLSA, an employee must meet the following three requirements:

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . .exclusive of board, lodging or other facilities;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200 (a). The Analyst Position that Mr. Henderson was hired to perform, and that he was striving to perform, meets all three requirements.

## I.    Salary Basis Requirement

It is undisputed that TTG paid Mr. Henderson at an annual salary rate of $35,000 per year, which is equivalent to roughly $700 per week. (Amend. Compl. ¶ 24; SUF ¶ 2.) It is also undisputed that Mr. Henderson received his salary in biweekly installments which were un-affected by the work he performed, as required by 29 C.F.R. § 541.602(a). (SUF ¶ 6.) Mr. Henderson thus satisfies the salary requirements of the Administrative Exemption.

## II.    Performance of Office Work Directly Related to General Business Operations

In order to qualify for the administrative exemption, an employee's "primary duty" must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R.

§ 541.200(a)(2). This means that "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a).

At TTG, Financial Analysts worked in teams with both Associates and Vice-Presidents to put together complex transportation financing deals. (Kolber Aff. ¶ 7.) Their work was directly related to TTG's general business operations as these transaction were the core service offered by TTG. *Id.* Moreover, this work, which involved investor marketing, client conferences and assisting in financial analysis, related directly to running TTG's business. FLSA's regulations specify advertising and marketing work as exempt administrative tasks, 29 C.F.R. § 541.201, much like Mr. Henderson's debt marketing responsibilities. (SUF ¶ 27; Compl. ¶ 24.)[4]

FLSA's Regulations draw a clear distinction between "marketing. . . financial products" (exempt) and "selling financial products" (non-exempt). 29 C.F.R. § 541.203(b). While factually distinct from the present case, a recent Second Circuit decision gives further guidance on where to draw the line between "administrative" and "production" jobs with respect to this prong of the test. *Davis* v. *J.P. Morgan Chase & Co.*, 587 F.3d 529, 532 (2d Cir. 2009). The court in *Davis* examined whether the primary duties of the plaintiff Whalen, a loan underwriter, were directly related to J.P. Morgan Chase's core business operations and found that they

---

[4]     Note that in the initial Complaint in this action, Mr. Henderson described his job responsibilities as "his duties included making corrections to drafts, composing emails, calling investors to market new products, worked on prototypes and photocopied documents." (Compl. ¶ 24.) Plaintiff's Counsel admitted to the Court on December 10, 2009 that certain deletions had been made from the Amended Complaint for the express purpose of overcoming Defendants' then-pending Motion to Dismiss.

were not, as Whalen was involved in the "production of loans." *Id*. at 534  Whalen was paid based on quantity ("average of total actions per day") not quality. *Id*.  He and other underwriters "were given a loan application and followed procedures specified in the Credit Guide in order to produce a yes or no decision." *Id*.  The Court found it significant that the company itself considered this to be "production work." *Id*.[5]

For Mr. Henderson, in contrast, contacting investors was one part of a larger process, and was a *means to an end*, not an *end in of itself*.  Mr. Henderson did not *sell* products but identified potential investors and contacted them to assess their level of interest in participating in the financing of transportation equipment, both for current deal and to gain market intelligence to inform structuring decisions for future deals.  (Henderson Tr. 52:18-53:6; Steuert Aff. ¶ 8.) *Davis* also cites approvingly to *Reich* v. *John Alden Life Insurance Co*., 126 F.3d 1, 10 (1st Cir. 1997), a First Circuit decision holding that "marketing representatives" of an insurance company who performed similar functions were exempt administrative employees.  *Davis*, 587 F.3d at 536.  By "disseminating information to the marketplace, understanding customers and competitors, and gathering available information," the representatives were "directly related to operations, and at the heart of John Alden's business success."  *Reich*, 126 F.3d at 12.  Similarly, in *Amendola* v. *Bristol-Myers Squibb Co*., the court found that pharmaceutical sales representatives

---

[5]     The Second Circuit has also given guidance as to the distinctions between sales and marketing work, though outside of the financial services industry, in the context of advertisement sales for a magazine.  In *Reiseck* v. *Universal Communications*, the Second Circuit held that an "advertising salesperson" did not qualify for the administrative exemption where she sold "standard products" directly to clients.  591 F.3d 101, 108 (2d Cir. 2010).  The court drew a distinction between the technical aspects of a sale (*ie*, completing the transaction at a cash register in a clothing store) and the larger strategic aspects of sales work, including "'marketing activity aimed at promoting (i.e., increasing, developing, facilitating, and/or maintaining) customer sales generally.'"  *Id*. quoting *Martin* v. *Cooper Electric Supply Co*., 940 F.2d 896, 905 (3d Cir. 1991).

sales and marketing work most likely satisfied the primary duty responsibility so as to defeat a request for class certification. 558 F. Supp. 2d 459, 476-77 (S.D.N.Y. 2008). The plaintiffs there represented their employer in meetings with potential customers and promoted their employer's products, work upon which their employer's success depended. *Id.*

## III. Exercise of Discretion and Independent Judgment

The final factor for eligibility for the administrative exemption is that the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). The exercise of discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Relevant factors include "whether the employee carries out major assignments in conducting the operations of the business" and "whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business." 29 C.F.R. § 541.202(b). However, "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e).

The Department of Labor has further explained that:

Other factors which federal courts have found relevant in assessing whether an employee exercises discretion and independent judgment include the employee's freedom from direct supervision, personnel responsibilities, troubleshooting or problem-solving activities on behalf of management, use of personalized communication techniques, authority to handle atypical or unusual situations, authority to set budgets, responsibility for assessing customer needs, primary contact to public or customers on behalf of the employer, the duty to anticipate competitive products or services and distinguish them from competitor's products or services, ad-

vertising or promotion work, and coordination of departments, requirements, or other activities for or on behalf of employer or employer's clients or customers.

Department of Labor, Wage and Hour Division, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; 69 Fed. Reg. 22122, 22144 (Final Rule, Apr. 23, 2004).

A. **Financial Analysts Exercised Discretion in Strategic and Debt Marketing Work**

Generally, Financial Analysts carried out "major assignments" that affected "business operations to a substantial degree," as the work they did was central to TTG's deal management process. 29 C.F.R. § 541.202(b). They completed this work as part of a team which included Vice-Presidents, and often all worked on the same types of tasks. (See Henderson Tr. 72:9-25; SUF ¶ 13.) Financial Analysts participated in group strategy meetings and client conference calls, and were expected to participate in the entire process of putting deals together from beginning to end. (Henderson Tr. 38:2-5; Kolber Aff. ¶ 7; SUF ¶ 24.)

The Department of Labor guidance as to certain exempt responsibilities includes acting as the "primary contact to public or customers on behalf of the employer." 69 Fed. Reg. at 22144. The record is clear that Mr. Henderson exercised this responsibility, and was responsible for 85 contacts by his fourth week. (SUF ¶ 29.) He both made phone calls and wrote numerous e-mail communications to potential investors that were his designated contacts. (Perlgut Decl. Exs. 10; 16-18; SUF ¶ 29.) In communicating with investors, Mr. Henderson and other Financial Analysts were expected to discuss the particular deals they were working on, and otherwise "wing it" in terms of gathering market intelligence and persuading the investors to pursue TTG opportunities. (Kolber Aff. ¶ 9; Henderson Tr. 45:19-21; 64:14-25; SUF ¶ 31.) Mr. Henderson testified that he developed a sales pitch for making these kinds of calls. (Henderson Tr.

53:11-13.)  The Department of Labor has advised that "use of personalized communication tech-niques" also falls within the meaning of independent judgment and discretion.  69 Fed. Reg. at 22144.  *See also In re Novartis Wage and Hour Litigation*, 593 F. Supp. 2d 637, 657 (S.D.N.Y. 2009) (Independent discretion prong satisfied when pharmaceutical representatives "[w]ithin the confines of the 'core messages' created by NPC,. . .must decide how best to present their infor-mation and must determine what type of 'close' is most appropriate in a given situation."); *Amendola* v. *Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 476 (S.D.N.Y. June 4, 2008) ("One additional factor is an employee's discretion to set her schedule and to tailor communications to a client's individual needs.")

In *Amendola*, the court held that pharmaceutical sales representatives ("PRs") likely qualified for the administrative exemption such that a collective action notice was not permitted to be sent.  *Amendola* v. *Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459 at 477. Evaluating their daily tasks, the court found that their daily activities reflected discretion and in-dependent judgment as to matters of significance as they required "'the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been con-sidered,'" and decisions made "'free from immediate direction or supervision.'" *Id*. (quoting 29 C.F.R. § 541.202(a), (c)).  The tasks considered included that: "PRs tailor the content of their presentations to each medical provider based on the provider's patient population, prescription practices, and other factors, and independently decide what promotional message will be most effective" and that they "strategically manage their call lists, exercising their own judgment in deciding how often to visit a doctor and whether to add new providers to their lists." *Id*.  *See also Schaefer-LaRose* v. *Eli Lilly and Co*, 663 F. Supp. 2d 674, 693-94 (S.D. Ind. 2009) (Finding that individual decisions about where and how to market products or services are an exercise of

discretion which relate "to matters of substantial significance": "Because sales representatives are Lilly's primary contact with physicians, the effectiveness of their marketing and promotional techniques attempting to influence medical providers' choices of drugs to prescribe determines in part whether those physicians ultimately prescribe Lilly's medications for their patients.").

Mr. Henderson testified that he similarly wrote communications to clients, researched potential clients and could tailor his own communication schedule as well. (*See* Henderson Tr. 54:15-19; 46:20-47:2; 47:6-14; 64:21-15; SUF ¶¶ 27-33.) As the First Circuit held in *Reich*:

> "The district court found, and we agree, that the marketing representatives exercise discretion and independent judgment in carrying out their duties. It is undisputed that these employees have discretion in choosing which agents to contact on any given day, and concerning which products to discuss with each agent. In addition, the marketing representatives rely on their own knowledge of an agent's business to help tailor proposals for the agent's end-customers. Further, they must be able to anticipate the competing products that the agent's customers might be considering, and distinguish John Alden's offerings from those of competitors. Thus, there is clear support in the record for the district court's conclusion that John Alden's marketing representatives exercise discretion and independent judgment in the course of their day-to-day agent contacts." 126 F.3d at 13.

Moreover, promotional work which requires "'a high degree of technical knowledge'" and calls for the use of "'skills or knowledge acquired through special training or experience'" has been found to be exempt work under the administrative exemption. *See Amendola*, 558 F. Supp. at 474-75 (quoting Applicability of Exemption for Administrative Employees to Medical Detailists, [1943-48 Wages-Hours] Lab. L. Rep. (CCH) P 33,093 (May 19, 1945)). Likewise, the phone calls that Financial Analysts made to potential investors required advanced financial statement knowledge to converse with sophisticated investors. (Kolber Aff. ¶ 20.)

Nor was debt marketing the only duty that required the application of advanced financial analysis skills. Financial Analysts helped put together sophisticated excel spreadsheets

utilizing amortization schedules for multiple pieces of debt, work that went well beyond "merely plugging in numbers." (Vanlangen Aff. ¶ 11; Kolber Aff. ¶ 14-16.) In *Zalewski* v. *PNC Financial Services Group*, the court adopted the Magistrate Judge's recommendation that summary judgment be granted for the defendant on the grounds that the plaintiff "accounting professional" and "financial analyst" qualified for the administrative exemption. 555 F. Supp. 2d 555, 564 (W.D. Pa. 2008). Her tasks that evidenced independent discretion and judgment included that she "reconciled several months of incorrect investment entities via 'ongoing correspondence with several service partners, as well as continual analysis of Intrader reports'" and "identified flaws in the investment subsystem and assisted the vendors in correcting them." *Id*. at 565.

### B.   Performance of Some Clerical Work Does Not Forfeit the Exemption

Mr. Henderson alleges that class members' responsibilities included "basic editing and making copies" (Amend. Compl. ¶ 32), and he testified that among his main responsibilities were, "were editing Word documents that were marketing materials, like looking for typos or formatting errors." (Henderson Tr. 22:16-25.) FLSA's Regulations are clear that the test to qualify for an applicable exemption revolves around the employee's "primary duties," and that the performance of some non-exempt work does not undo the otherwise applicable exemption. 29 C.F.R. § 541.700. Mr. Henderson estimated that roughly half his time spent working was spent on debt marketing calls and that this was the task on which he spent the most time. Henderson Tr. 60:9-25; SUF ¶ 34). Thus, the debt marketing calls would be considered Mr. Henderson's "primary duty." See 29 C.F.R. § 541.700(b) ("[E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work.").

TTG had secretarial and office support staff intended to assist Financial Analysts, Associates and other employees with clerical office work. (Kolber Aff. ¶¶ 24-25; Henderson Tr. 33:20-24; SUF ¶ 15.) That Mr. Henderson may not have fully utilized these resources does not change the nature of the duties underlying his job.

## C. The Fact of Supervision Does Not Forfeit the Exemption

That Mr. Henderson did not make final decisions as to the structure of investments or was otherwise given assignments or guidance from Senior Analysts, Associates or Vice-Presidents does render him a non-exempt employee. (Amend. Compl. ¶ 27.) FLSA's Regulations provide that "the term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review and "the fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment. 29 C.F.R. § 541.202(c). *See also Amendola*, 558 F. Supp. at 474.

The Regulations expressly contemplate that employees may write early drafts that are reviewed and revised before being sent to clients:

> For example. . . .the management consultant who has made a study of the operations of a business and who has drawn a proposed change in organization may have the plan reviewed or revised by superiors before it is submitted to the client. 29 C.F.R. § 541.202(c).

D.   **Mr. Henderson's Inability to Perform Certain Job Duties Does Not Render Him Non-Exempt**

The Regulations are clear that "[a] job title alone is insufficient to establish the exempt status of an employee." 29 CFR § 541.2.[6] Rather, "[t]he exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's *salary and duties* meet the requirements of the regulations in this part." (emphasis added). As discussed above, the legislative history of the FLSA makes clear that the purpose of the exemptions was to make exempt white collar employees with generous salaries and benefit packages who did not do repetitive work which could be split into units or passed on to other employees. 69 Fed. Reg. at 22123-24. Employers must therefore be able to rely on the negotiated salary and job duties assigned to a class of employee in determining whether the exemption applies, rather than by looking at the exact tasks performed by each employee every pay period.

The fact that Mr. Henderson, by his own admission, was struggling to complete both his assignments and even his training does not change the nature of the position he was hired for and expected to perform. Mr. Henderson himself testified he expected that if he had stayed longer at TTG that he would have been "doing more spreadsheet work. I was doing the other work because I didn't receive the training." (Henderson Tr. 25:5-12). For example, when he attended a group meeting with all of the other analysts, the material covered was "kind of beyond" him. (Tr. 30:11-31:10.) In contrast, "for the other analysts who were working on the modeling . . .this was supposed to help them go over some of the intricacies of things that they

---

[6]    Though the Second Circuit has noted that "[t]hese labels may prove useful as a court endeavors to understand the scope of an employee's duties in that particular trade or industry." Reiseck, 591 F.3d at 107 n.8.

would need to change in the Excel." *Id.*   He also stated that "ideally" he would have character-ized his work as work done as part of a team, "like if I had known more.  I didn't really like not to help out much."  (Henderson Tr. 38:21-25.)  The analysts who had been there longer did "know more."  (Henderson Tr. 39:1-3.)  And when Mr. Henderson and other analysts were all asked to produce aircraft pricing models, he testified, "I wasn't able to do my part."  *Id.* (*See also* Henderson Tr.57:22 - 58:1) ("Q.  Do you know why you were cc'd on this document?   A.  Because I was a part of the team and the hope was that some day I would be able to help.")[7]

Cases applying the FLSA exemptions have permitted some flexibility with re-gards to the discretion exercised in the first few months of employment.  *See, e.g., Reiseck* v. *Universal Communications*, 06 Civ. 0777, 2009 U.S. Dist. LEXIS 26013, at *15 (S.D.N.Y. Mar. 25, 2009) (Griesa, J.) ("[P]laintiff exercised discretion and independent judgment. She testified that she solicited new clients, negotiated contracts with clients, and determined what rates they would pay. This demonstrates that she exercised discretion and independent judgment, ***even though she was required to consult with Gollan about these decisions during the first months of her employment*** with Universal. Plaintiff was therefore not entitled to overtime pay, and de-fendants are entitled to summary judgment on this claim." ) (emphasis added); rev'd on other grounds, *Reiseck* v. *Universal Communications. of Miami, Inc.*, 591 F.3d 101 (2d Cir. 2010).

---

[7]    Moreover, at the point when Mr. Henderson should have been taking on increasing responsibili-ties, the market for aircraft financing dried up.  (Steuert Aff. ¶¶ 11-13, Henderson Tr. 15:13-16:3.)

## IV. The Regulations' Example of Qualifying Financial Employees Corresponds to the Work Performed by Financial Analysts at TTG

FLSA's Regulations also give several examples of employees who qualify for the administrative exemption on *both* of the remaining prongs, one of which is specific to employees in the financial services industry like the employees of TTG:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products.

29 C.F.R. § 541.203(b). This describes almost exactly the debt marketing and promotion and other deal work performed by Mr. Henderson and the other Financial Analysts at TTG.

By analogy to this language, TTG had two types of "customers": the clients whose investment products it sought to finance, and the investors and lessees it sought to provide financing. (Kolber Aff. ¶ 4.) The financial modeling constructed and performed by Financial Analysts, whether as to the whole or filling in pieces, involved collecting and analyzing information regarding their clients' equity, among other variables. (Kolber Aff. ¶ 15; SUF ¶ 22.) Henderson and the other Financial Analysts also marketed and promoted these investment opportunities to potential investors, responding to investor questions or suggesting alternative opportunities. (Kolber Aff. ¶¶ 9, 13; SUF ¶¶ 19, 27.)

## V. The Analysis is Identical Under New York Law

The New York Labor Law regulations on overtime payment specify that "employee" as defined in the statute "does not include any individual permitted to work in, or as:. . . Executive, administrative or professional capacity." 12 N.Y.C.R.R. § 142-2.14. An employee working in an administrative capacity is defined as:

(a) whose primary duty consists of the performance of office or nonmanual field work directly related to management policies or general operations of such individual's employer;

(b) who customarily and regularly exercises discretion and independent judgment;

. . . .

(d) who is paid for his services a salary of not less than:. . . (4) $ 536.10 per week. . . . 12 N.Y.C.R.R. § 142-2.14.

Given the similarity of the test to the one set forth in FLSA, courts apply the same analysis to New York Labor Law claims. *See Franklin* v. *Breton International, Inc.*, 06 Civ. 4877 (DLC), 2006 U.S. Dist. LEXIS 88893, at *13 (S.D.N.Y. Dec. 11, 2006) ("The regulations under the New York Labor Law largely adopt the exemptions to the FLSA's overtime requirements. N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2. Because [plaintiff] is an exempt employee under the FLSA, he is also exempt under the overtime requirements of the New York regulation and his state law claims for overtime pay must be dismissed.").

## <u>CONCLUSION</u>

For the foregoing reasons, the judgment as a matter of law should be granted with respect to all of Plaintiff's claims.

Dated:   March 1, 2010
         New York, New York

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

By:     /s/ David G. Januszewski
       David G. Januszewski
       Lauren Perlgut
80 Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Defendants The Transportation Group, Ltd. and Joseph Steuert*
