**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ──────────────────────────── )<br>THEODORE HENDERSON, on behalf of himself and )<br>those similarly situated, )<br> )<br>                                      Plaintiff, )<br> )<br>                - *against* - )<br> )<br>THE TRANSPORTATION GROUP, LTD., and JOSEPH )<br>STEVERT, )<br> )<br>                       Defendants. )<br>──────────────────────────── ) | Case No. 09 CIV 7328 (DLC) |

**MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR CONDITIONAL
CERTIFICATION**

CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
(212) 701-3000

*Attorneys for Defendants The Transportation
Group, Ltd. and Joseph Steuert*

Of Counsel:

David G. Januszewski
Lauren Perlgut

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

    I.   Henderson's Duties Contrasted With Those Of Other Analysts ................................ 3

    II. Henderson's Duties Contrasted With Those Of Associates ...................................... 6

LEGAL STANDARD ...................................................................................................... 7

ARGUMENT .................................................................................................................... 8

    I.   The Post-Discovery Standard Should Be Applied ...................................................... 9

    II.  Plaintiff's Conclusory Unsupported Allegations Do Not Satisfy His Burden Under Either Standard ...................................................................................................................... 10

    III. Henderson Was Not Similarly Situated To Other Analysts ....................................... 11

    IV. Henderson Was Not Similarly Situated To Associates ............................................. 14

    V.  The Necessary Fact-Specific Inquiry Into Each Plaintiff's Duties Renders Collective Treatment Inappropriate ........................................................................................................ 15

    VI. Defendants Will Succeed At Trial In Proving That The Employees Are Not Entitled to Overtime Compensation ..................................................................................................... 16

CONCLUSION ................................................................................................................ 18

**TABLE OF AUTHORITIES**

Page

Cases

*Alonso* v. *Uncle Jack's Steakhouse, Inc.*, 648 F.Supp.2d 484 (S.D.N.Y. 2009) .................................................................................................... 2n

*Amendola* v. *Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459 (S.D.N.Y. June 4, 2008) .......................................................................................... 1n, 7-8, 16

*Ayers* v. *SGS Control Services, Inc.*, No. 03-civ-9078 (RMB) (RLE), 2004 U.S. Dist. LEXIS 25646 (S.D.N.Y. Dec. 16, 2004)............................. 10

*Bah* v. *Shoe Mania, Inc.*, No. 08 Civ. 9380, 2009 U.S. Dist. LEXIS 40803 (S.D.N.Y. May 13, 2009) ..................................................................... 1n-2n

*Barfield* v. *New York City Health & Hospitals Corp.*, No. 05 Civ. 6319 (JSR), 2005 U.S. Dist. LEXIS 28884 (S.D.N.Y. Nov. 18, 2005)................... 10-11

*Chowdhury* v. *Duane Reade, Inc.*, 06 Civ. 2295 (GEL), 2007 U.S. Dist. LEXIS 73853 (S.D.N.Y. Oct. 2, 2007)........................................................... 10, 13n-14n

*Cooke* v. *General Dynamics Corp.*, 993 F.Supp. 56 (D.Conn.1997) ................. 15

*Damassia* v *Duane Reade, Inc.*, 04 Civ. 8819 (GEL), 2006 U.S. Dist. LEXIS 73090 (S.D.N.Y. Oct. 4, 2006) .......................................................... 10, 13n-14n

*Davis* v. *Lenox Hill Hospital*, 03 Civ. 3746 (DLC), 2004 U.S. Dist. LEXIS 17283 (S.D.N.Y. Aug. 31, 2004)....................................................... 11-12

*Delaney* v. *Geisha NYC, LLC*, 261 F.R.D. 55 (S.D.N.Y. 2009) ........................ 2n

*Diaz* v. *Electronics Boutique of America, Inc.*, No. 04 Civ. 840E, 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 17, 2005) ................................... 15

*Evancho* v. *Sanofi-Aventis*, NO. 07-2266 (MLC), 2007 U.S. Dist. LEXIS 93215 (D.N.J. Dec. 19, 2007)........................................................... 16

*Fasanelli* v. *Heartland Brewery, Inc.*, 516 F. Supp.2d 317 (S.D.N.Y. 2007) .................................................................................................... 9

*Hallissey* v. *America Online, Inc.*, No. 99-CIV-3785 (KTD), 2008 U.S. Dist. LEXIS 18387 (S.D.N.Y. Feb. 19, 2008) ............................................. 2n

*Hendricks* v. *J.P. Morgan Chase Bank, N.A.*, 263 F.R.D. 78 (D. Conn. 2009) .................................................................................................... 9-10, 12, 13, 14

<u>Page</u>

*Hnot* v. *Willis Group Holdings Ltd.*, 228 F.R.D. 476 (S.D.N.Y. 2005) .............. 8

*Hoffmann-La Roche, Inc.* v. *Sperling*, 493 U.S. 165 (1989).............................. 7

*Jacobs* v. *N.Y. Foundling Hospital*, 483 F. Supp. 2d 251 (E.D.N.Y. 2007) ............................................................................................................... 8

*Lewis* v. *National Financial Systems, Inc.*, No. 06-1308 (DRH) (ARL), 2007 WL 2455130 (E.D.N.Y. Aug. 23, 2007) ............................................... 9

*Mendoza* v. *Casa De Cambio Delgado, Inc.*, No. 07 Civ. 2579 (HB), 2008 U.S. Dist. LEXIS 27519 (S.D.N.Y. Apr. 7, 2008)............................... 10, 13

*Mike* v. *Safeco Insurance Company of America*, 274 F. Supp. 2d 216 (D. Conn. 2003) .............................................................................................. 15

*Morales* v. *Plantworks, Inc.*, No. 05 Civ 2349 (DC), 2006 U.S. Dist. LEXIS 4267 (S.D.N.Y. Feb. 2, 2006)............................................................ 10

*Sexton* v. *Franklin First Financial, Ltd.*, No. 08-CV-04950 (JFB) (ARL), 2009 U.S. Dist. LEXIS 50526 (E.D.N.Y. June 19, 2009) .................. 15-16

*Thiessen* v. *General Electric Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001) .......................................................................................................... 8

*Torres* v. *Gristede's Operating Corp.*, 04 Civ 3316 (PAC), 2006 U.S. Dist. LEXIS 74039 (S.D.N.Y. Sept. 28, 2006) ............................................. 8, 9

<u>Regulations</u>

Labor Regulations

29 C.F.R. § 541.203(b) (2010) ....................................................................... 17

<u>Statutes</u>

Fair Labor Standards Act

29 U.S.C. §§ 201-219 (2006), as amended ................................................... 7
29 U.S.C. § 216(b) ........................................................................................ 7

Defendants The Transportation Group, Ltd. and Joseph Steuert (collectively, "Defendants") respectfully submit this Memorandum of Law in opposition to Plaintiff's "Motion for Conditional Certification."[1]

## INTRODUCTION

Under the Fair Labor Standards Act, employees may bring claims only on behalf of themselves and others who are "similarly situated." The burden is thus on Plaintiff Theodore Henderson ("Henderson") to demonstrate that he is "similarly situated" to the other employees to whom he seeks this Court's authorization and imprimatur to send collective action notice. Yet Henderson admits that there was a sharp division between his job responsibilities and those of other "Analysts who were more senior," who were "helping the senior people." (Pl. Br. at 2.) Henderson concedes that "some individuals were required to perform 'different' tasks than Mr. Henderson," (Pl. Br. at 2.), and that "the 'more experienced' Analysts and Associates had a different job." (Pl. Br. at 3.) The tasks assigned to and hours worked by Henderson in his mere seven weeks of employment differ substantially from those of his former colleagues. Given these wide factual variations, collective action treatment would result in inefficiency over individual proceedings, and would not be fair to either Defendants or to potential opt-in plaintiffs.[2]

---

[1] While Plaintiff Henderson has moved for "conditional certification" of this case as a collective action and seeks such an order (Memorandum of Law in Support of Plaintiff's Motion for Conditional Certification ("Pl. Br.") at 1), neither the Fair Labor Standards Act ("FLSA") nor the Federal Rules of Civil Procedure provide for the certification of an FLSA collective action. *See Amendola* v. *Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 462 n.1 (S.D.N.Y. 2008) (treating motion for conditional certification as a request for authorization of notice).

[2] For the reasons discussed below, the Court should deny Henderson's motion for authorization to send any notice. Additionally, Henderson's proposed notice is deficient in several respects, in-

Footnote continued on next page.

# STATEMENT OF FACTS

As set forth in Defendants' pending Motion for Summary Judgment and support-

ing material thereto, Henderson was employed at the Transportation Group (Capital) Limited

("TTG"), a boutique investment bank, as a financial analyst ("Financial Analyst" or "Analyst")

for just seven weeks in early 2009.[3]  TTG classified Henderson as an Administrative employee

exempt from the overtime payment requirements of the Fair Labor Standards Act.   Per this

Court's instructions, the parties have engaged in discovery as to Henderson's eligibility for the

Administrative Exemption and have exchanged documents and discovery responses.   Defendants

conducted the deposition of Henderson on February 12, 2010.[4]

It is clear from Henderson's testimony that his seven weeks at TTG were punctu-

ated by his own confusion and frustration at his inability to perform the same tasks as his fellow

---

Footnote continued from previous page.

cluding that it does not inform potential plaintiffs that "they may be asked to (1) appear for depo-
sitions; (2) respond to written discovery; (3) testify at trial and/or (4) pay litigation costs." *Bah* v.
*Shoe Mania, Inc.*, No. 08 Civ. 9380, 2009 U.S. Dist. LEXIS 40803, at *11-*12 (S.D.N.Y. May
13, 2009); *Hallissey* v. *America Online, Inc.*, No. 99-CIV-3785 (KTD), 2008 U.S. Dist. LEXIS
18387, at *12 (S.D.N.Y. Feb. 19, 2008), and his request for access to the Social Security numbers
of TTG employees is preliminary and unjustified.  *Alonso* v. *Uncle Jack's Steakhouse, Inc.*, 648
F. Supp. 2d 484, 489-490 (S.D.N.Y. 2009); *Delaney* v. *Geisha NYC, LLC*, 261 F.R.D. 55, 60
(S.D.N.Y. 2009).

[3]   *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment [DKT 31];
Defendants' Statement of Uncontested Facts Pursuant to Rule 56.1 [DKT 36] ("SUF"); the Decla-
ration of Lauren Perlgut, dated March 22, 2010 [DKT 39] ("Perlgut Decl."); Affidavit of Charles
Kolber, Managing Director of TTG, dated Feb. 25. 2010 [DKT 33] ("Kolber Aff."); the Affidavit
of Joseph J. Steuert, Chairman and CEO of TTG, dated March 1, 2010 [DKT 34] ("Steuert Aff.");
and the Affidavit of Thomas Vanlangen, formerly a Vice-President at TTG, dated March 1, 2010
[DKT 35] ("Vanlangen Aff.").

[4]   The transcript of Henderson's deposition, conducted on February 12, 2010 is Exhibit 3 to Perlgut
Decl.

Analysts, some of whom supervised his work. (Henderson Tr. 38:21-29:3, 57:19-58:1; Compl. ¶ 27.)[5] He reiterated again and again in his testimony that he was ***not*** involved in the same tasks as the other Analysts, tasks so central to the Analyst position that Henderson described these under the TTG job descriptions in his own resumé.

During the short time Henderson was employed, TTG was a boutique investment bank "focused on providing investment offerings, investment research and arrangement and advisory services related to the aviation and rail transport industries." (Perlgut Decl. Ex. 2.) TTG arranged "the financing of transportation equipment by bringing together investors/lenders with corporations that require financing." (Kolber Aff. ¶ 4.) The work in the early stages of structuring a deal could be categorized broadly as marketing work to find potential investors and modeling and analysis work to tailor the deal to market interest.[6] TTG's employees were thus broken into two teams, each of which focused on either the marketing or analysis. (Henderson Tr. 16:21-17:2.)

## I.     Henderson's Duties Contrasted With Those Of Other Analysts

In his resumé, Henderson himself characterized the Analyst position at TTG as:

---

[5]     The Complaint alleges: "Mr. Henderson did not make any decisions relating to his work on a daily basis as these decisions were made by Defendant Steuert, who gave his orders to the Vice President or Senior Analysts who handed them down to members of the class." (Compl. ¶ 27.) As there was no separate "Senior Analyst" position at TTG, the statement refers to other Analysts, generally.

[6]     During Henderson's brief employment, he did not participate in a deal which had moved beyond the initial stages. (Henderson Tr. 79:16-23; Steuert Aff. ¶ 12.) Additional tasks associated with closing a deal included negotiating terms and preparing term sheets, and documenting the deal. (Kolbert Aff. ¶ 5; Steuert Aff. ¶ 7.)

"Pricing asset-backed loan schedules and structuring the acquisition or refinancing of commercial aircraft for the boutique investment bank. Automating generation of transaction models and marketing material using [Visual Basic for Applications]. Performing debt marketing support." (Perlgut Decl. Ex. 7.)

Henderson testified, however, that he was not in fact personally involved in "pricing asset-backed loan schedules" nor "structuring the acquisition or refinancing of commercial aircraft," though other Analysts were:

"Q.    Let's turn back to your resume, Exhibit 1. I would like to walk through how you described your work at TTG under 'Professional Experience.' So the first thing says 'Pricing asset-backed loan schedules.' What did that entail?

A.    This isn't really entirely relevant to what I was doing there.

Q.    So you were not involved in pricing asset-backed loan schedules?

A.    I was in the being taught to do it phase pretty much the whole time, so we didn't really have many teaching sessions.

Q.    *Were other analysts involved in pricing asset-backed loan schedules*?

A.    *Some of the ones who had been there longer were doing more, but myself and actually the other guy that was hired with me, actually he was there even less*." (Henderson Tr. 17:11-18:5) (emphasis added).

*        *        *

"Q.    Did you ever personally assist in structuring the acquisition or refinancing of commercial aircraft?

A.    Not to any significant extent. I can't really say that I helped structure the financings, but I wanted to.

Q.    *But analysts who were more senior to you were performing those tasks*?

A.    *They weren't performing the whole tasks, but they were helping the senior people*." (Henderson Tr. 19:11-20) (emphasis added).

In contrast, James Pak, another former Analyst, did perform these duties. In an affidavit submitted in connection with Plaintiff's moving brief, he stated: "my duties included financial modeling, preparing marketing materials and cold calling prospective clients. Specifically, I was responsible for creating pricing models, sensitivity analysis, and marketing material.

These duties varied from client to client." (Affirmation of Jesse C. Rose [DKT 37] ("Rose Aff.")

Ex. 3, Affidavit of James Pak ("Pak Aff.") ¶ 2.)

Discussing one such modeling assignment which had been given to a number of employees, including other Analysts, Henderson recalled: "Each number represented an aircraft, and they were supposed to work on the alternative pricing for the aircraft that they were assigned. I remember I wasn't able to do my part." (Henderson Tr. 56:21-25.) Other Analysts had completed the assignment:

> "Q.     I'm going to call your attention to Exhibit 14. This was an assignment that you had been given from Tom Vanlangen on March 10, 2009?
>
> A.     Yes.
>
> Q.     You stated that you were not able to complete this assignment?
>
> A.     Right.
>
> Q.     Did other analysts complete this assignment?
>
> A.     Yes.
>
> Q.     What did the assignment entail?
>
> A.     It entailed updating these base case pricing models to the alternative case. We were just using different rates, we were changing one key rate or something." (Henderson Tr. 80:24-81:17).

Henderson explained that he did not have the financial background and had not completed the training necessary to complete these tasks, but if he had been employed at TTG longer, he "probably would have been doing more spreadsheet work. I was doing the other work because I didn't receive the training." (Henderson Tr. 24:13-25:12). Henderson linked other Analysts' work product to this training, admitting that he never got to the level of other Analysts:

> "Q.     So is this a more advanced version of the homework assignment?
>
> A.     This is the real thing. I never got to this level.

Q.      Did other analysts get to that level?

A.      Where they could help in filling these out, yes." (Henderson Tr. 55:11-18)

\*      \*      \*

"Q.      How did the material being taught relate to the analysts' responsibilities?

"A.      *For the other analysts who were working on the modeling behind* it I think it was supposed to -- I'm getting confused between this and another one, I think this was supposed to help them go over some of the intricacies of things that they would need to change in the Excel. *Like I said, it was kind of beyond me*." (Henderson Tr. 31:2-10) (emphasis added)

Overall, the "role of a TTG analyst who had completed the training" consisted of:

"They would be there supporting the VPs and the associates in doing the things that I was doing, the basic stuff like fixing the grammar errors and printing out copies. Then they would also be helping on the phone calls I was doing. *But since they had more training they would be helping more with the actual loan pricing*. So they might have a couple of call-ins of it that they were responsible for getting done." (Henderson Tr. 71:19-72:8) (emphasis added)

As for the other tasks listed on his resumé, "automating generation of transaction models and marketing material using VBA," Henderson admits that this was a special project unique to him, that no other Analysts or Associates worked on. (Henderson Tr. 19:21-21:13.) This was a project that he had proposed on his own initiative and been given approval to work on. (Henderson Tr. 53:7-10.) Finally, Henderson testified that he took on a larger number of debt marketing contacts than his fellow employees. (Henderson Tr. 61:3-9.)

## II.      Henderson's Duties Contrasted With Those Of Associates

While in the Amended Complaint, Henderson purports to represent a class consisting of "employees of Defendants who worked as Associates and/or Analysts," (Compl.¶ 10), Henderson admitted at his deposition that he was unaware that he purports to represent Associates, and he testified that he had little understanding of what the Associate position even entailed. (Henderson Tr. 35:9-11; 63:21-25.) At first, Henderson was unsure if there was even an Associ-

ate position at all: "I think there was also an associate position or maybe it was just senior analyst." (Henderson Tr. 35:9-11.) Henderson then explained how the responsibilities of one Associate, Seung Lee, differed from his own because she acted as a "point person" and "leader" in financial modeling:

> "She had been there for a while, so she knew kind of all the ins and outs. She was really the leader in getting stuff done like making the models, she was really the point person. So even though she wasn't the one who decided what things had to be done, like she would know where mistakes were, what things need more work. She really kind of took charge in that sense at least, everyone kind of relied on her." (Henderson Tr. 36:10-22.)

## LEGAL STANDARD

The Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, provides a private right of action to recover unpaid overtime compensation "against any employer . . . by any one or more employees for and on behalf of himself or themselves and other employees *similarly situated*." 29 U.S.C. § 216(b) (emphasis added). While the FLSA does not provide for the certification of a collective action, Section 216(b) further provides that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. 216(b). By this motion, Henderson seeks this Court's authorization of notice pursuant to this provision.

"District courts may set the conditions under which a plaintiff gives notice to fellow employees of the existence of a collective action and the steps they must take if they wish to join the action." *Amendola* v. *Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 467 (S.D.N.Y. 2008) (citing *Hoffmann-La Roche, Inc.* v. *Sperling*, 493 U.S. 165, 169 (1989)). A plaintiff must demonstrate that the employees who will be receiving notice are "similarly situated to the plaintiff." *Id.* However, "where a plaintiff fails to carry this burden or where a defendant employer

shows either that the potential recipients of the notice are not similarly situated to the plaintiff or that it will likely succeed at trial in proving that the employees are not entitled under the FLSA to overtime compensation, a court may refuse to authorize notice or postpone deciding the issue pending further discovery and motion practice." *Id.*

While generally plaintiffs have the burden to make a "modest factual showing" that they were subject to a "common policy or plan that violated the law," *id.* (citation and internal quotation marks omitted), where such a determination is sought *post*-discovery courts instead apply "heightened scrutiny." *Torres* v. *Gristede's Operating Corp.*, 04 Civ. 3316 (PAC), 2006 U.S. Dist. LEXIS 74039, at *29 (S.D.N.Y. Sept. 28, 2006); *see also Jacobs* v. *New York Foundling Hospital*, 483 F. Supp. 2d 251, 265 (E.D.N.Y. 2007) ("When the case is in its later stages, as is true here, a more heightened scrutiny is applied to the similarly situated question than if it is in pre-discovery."). In the pre-discovery stage, courts determine "'on an ad hoc case-by-case basis, whether plaintiffs are "similarly situated."'" *Torres*, 2006 U.S. Dist. LEXIS 74039, at *30 (quoting *Thiessen* v. *General Electric Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001)). In a review after discovery, however, courts consider "several factors, among which the relevant ones include (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Id.* (citation and internal quotation marks omitted).

## ARGUMENT

Henderson notes that he bears the burden to show that "all members of the proposed class were subjected to 'common issues of fact or law.'" (Pl. Br. at 6 (quoting *Hnot* v. *Willis Group Holdings Ltd.*, 228 F.R.D. 476, 482 (S.D.N.Y. 2005).) The evidence in the record demonstrates that Henderson's responsibilities were unique and factually distinct from those of

his alleged peers, and plainly refutes his contention that he was "similarly situated" to these fellow employees, under either the pre-discovery or post-discovery standards.

## I.      The Post-Discovery Standard Should Be Applied

Per this Court's instructions on December 10, 2009, the parties have exchanged documents and discovery responses, and conducted the deposition of Henderson. The post-discovery standard of heightened scrutiny should thus apply to a determination of whether Henderson was "similarly situated." *See Torres*, 2006 U.S. Dist. LEXIS 74039, at *29 ("Post-discovery, as is the case with the instant motion, the Court applies heightened scrutiny to this inquiry as compared to pre-discovery."). Henderson thus mistakenly relies on the pre-discovery burden of making "'a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law.'" (Pl. Br. at 5 (quoting *Lewis* v. *National Financial Systems, Inc*., No. 06-1308 (DRH) (ARL), 2007 WL 2455130, at *3 (E.D.N.Y. Aug. 23, 2007).)

Moreover, Henderson's contention that the "'initial class certification determination must be made on preliminary documents such as pleadings and affidavits, which necessarily contain unproven allegations'" is belied by his own citations to evidence developed in discovery. (Pl. Br. at 6 (quoting *Fasanelli* v. *Heartland Brewery, Inc*., 516 F. Supp. 2d 317, 322 (S.D.N.Y. 2007).) In *Fasanelli*, the parties had not yet engaged in ***any*** discovery. *See Fasanelli*, 516 F. Supp. 2d at 321 (discussing "the appropriate inquiry at this ***pre-discovery*** stage") (emphasis added); *see also Hendricks* v. *J.P. Morgan Chase Bank, N.A*., 263 F.R.D. 78, 83 (D. Conn. 2009) ("JPMorgan argues that, because of extensive discovery that has already taken place in this case, the court should assess plaintiffs' Motion as if it were at the second step. The court agrees that it should determine whether to certify this collective action based on the full evidence before it,

rather than merely examining the 'pleadings and affidavits,' as courts do at the first step."); *but see Damassia* v. *Duane Reade, Inc.*, 04 Civ. 8819 (GEL), 2006 U.S. Dist. LEXIS 73090, at *12-*13 (S.D.N.Y. Oct. 4, 2006); *Chowdhury* v. *Duane Reade, Inc.*, 06 Civ. 2295 (GEL), 2007 U.S. Dist. LEXIS 73853, at *7-*11 (S.D.N.Y. Oct. 2, 2007).

## II.     Plaintiff's Conclusory Unsupported Allegations Do Not Satisfy His Burden Under Either Standard

While the [pre-discovery] standard for determining if an employee is similarly situated is a "liberal standard," "conclusory allegations or lack of a nexus with the putative class will prevent the case from moving forward as a collective action." *Mendoza* v. *Casa De Cambio Delgado, Inc.*, No. 07 Civ. 2579 (HB), 2008 U.S. Dist. LEXIS 27519, at *4 (S.D.N.Y. Apr. 7, 2008); *see also Ayers* v. *SGS Control Services, Inc.*, No. 03-civ-9078 (RMB) (RLE), 2004 U.S. Dist. LEXIS 25646, at *15 (S.D.N.Y. Dec. 16, 2004) ("[T]he Court will not find that putative class members are similarly situated based solely on plaintiffs' allegations that defendants committed widespread wrongdoing if there is a total lack of factual support for those allegations.") (citation omitted).  In *Mendoza*, the court denied the plaintiffs' request for collective certification because of the "lack of factual allegations in the affidavits or complaint to show that the Plaintiffs are similarly situated with the other employees."  2008 U.S. Dist. LEXIS 27519, at *6-*7. In particular, "[t]he affidavits by the former employees appear to be boilerplate and virtually identical."  *Id*. at *6; *see also Morales* v. *Plantworks, Inc.*, No. 05 Civ. 2349 (DC), 2006 U.S. Dist. LEXIS 4267, at *6-*7 (S.D.N.Y. Feb. 1, 2006) (denying conditional certification where "plaintiffs have offered only a conclusory allegation in their complaint; they have offered nothing of evidentiary value"); *Barfield* v. *New York City Health & Hospitals Corp.*, No. 05 Civ. 6319 (JSR), 2005 U.S. Dist. LEXIS 28884, at *3 (S.D.N.Y. Nov. 17, 2005) (denying certifica-

tion where plaintiff provided "nothing but limited anecdotal hearsay to suggest that there is wide-spread practice").

Here too, Henderson has offered only the most conclusory allegations to show that the potential plaintiffs were subject to a "common policy or plan that violated the law": two citations to the Complaint alleging that Henderson and his peers worked in excess of 50 or 60 hours per week, the affidavit of one former Analyst which in large part parrots the Complaint virtually verbatim[7], and two page cites from Henderson's deposition, one of which merely reflects questions reading those same paragraphs of the Complaint aloud. (Pl. Br. at 8 citing Henderson Tr. 66.) The other transcript citation is to the question by Henderson's own attorney, "were [Associates] subject to the same policy as analysts in that they were not paid overtime by TTG," to which Henderson responded "yes." (Pl. Br. at 8 citing Henderson Tr. 33.) Plaintiff points to no further testimony by Henderson that supports the claim that he performed similar work or received similar treatment to other potential plaintiffs, particularly as he testified the very opposite, as discussed above. Moreover, Henderson has not alleged any additional facts to support his claims that Analysts and Associates were treated identically.

## III. Henderson Was Not Similarly Situated To Other Analysts

The test for whether a plaintiff is "similarly situated" to other employees is "whether there is a 'factual nexus' between the claims of the named plaintiff and those who have chosen to opt-in to the action." *Davis* v. *Lenox Hill Hospital*, 03 Civ. 3746 (DLC), 2004 U.S. Dist. LEXIS 17283, at *23 (S.D.N.Y. Aug. 31, 2004) (citation omitted). As discussed above,

---

[7]   The Affidavit of James Pak parrots many of Henderson's allegations so closely that it even erro-neously cuts and pastes the dates of *Henderson's* employment at TTG. See Pak Aff. ¶ 1; *compare with* Consent to Join Collective signed by James Pak, filed Feb. 12, 2010 [DKT 23].

and conceded by Henderson in his moving brief, (Pl. Br. at 2), Henderson's employment differed substantially from other Analysts, in both the quantity and types of tasks performed — both factors necessary to determining whether Defendants have mischaracterized these employees as "exempt," and thus face potential liability for overtime compensation.

Specifically, Henderson did not price asset-backed loan schedules, structure the acquisition or refinancing of commercial aircraft or perform the sophisticated modeling work that other Analysts did perform, and may have comprised their primary duties. (Henderson Tr. 17:11-18:5; 19:11-20; 31:2-10; 71:19-72:8; 80:24-81:17.) In contrast, James Pak, another former Analyst, did perform these duties: "my duties included financial modeling, preparing marketing materials and cold calling prospective clients. Specifically, I was responsible for creating pricing models, sensitivity analysis, and marketing material. These duties varied from client to client." (Pak Aff. ¶ 2.)

Henderson testified that he was not performing the same financial analyses as other Analysts because he did not have the financial background and had not received the necessary training. (Henderson Tr. 24:13-25:12, 31:2-10, 55:11-18, 71:19-72:8.) The court in *Hendricks* found it significant that some putative class members required specialized accounting knowledge to perform their job functions, while others did not: "[t]he fact that the potential class members in this case, unlike Hendricks and Minzie, were situated in roles where accounting knowledge was essential, bears on the court's conclusion that the FLSA collective action should not be certified." 263 F.R.D. at 85-86.

When the financial crisis fully impacted TTG in the spring of 2009, shortly after Henderson's hiring, the type and quantity of available work changed even further. (Steuert Aff. ¶¶ 11-13.) Henderson testified that this period "was slow in the sense that there wasn't actually

-12-

stuff to do. During the business hours it was like there would be nothing going on, you would just come up with your own stuff, come up with your own things to do." (Henderson Tr. 15:7-12.) One such project, an endeavor to automate pricing models using VBA was suggested by Henderson on his own initiative and undertaken by no other employees. (Henderson Tr. 19:21-21:13.) As Henderson testified, his hours fluctuated depending on upcoming deadlines. (Tr. 71:16-18.) His inexperience, differing responsibilities, and the general work slowdown mean that these hours are likely very different from other Analysts employed a year earlier or even concurrently. In *Mendoza*, the court considered variations in the hours worked by the potential plaintiffs in finding that they were not similarly situated. *Mendoza* v. *Casa De Cambio Delgado, Inc.*, No. 07 Civ. 2579 (HB), 2008 U.S. Dist. LEXIS 27519, at *8-*10 (S.D.N.Y. Apr. 7, 2008).

In the Amended Complaint, Henderson alleges that he took orders from other Analysts: "Mr. Henderson did not make any decisions relating to his work on a daily basis as these decisions were made by Defendant Steuert, who gave his orders to the Vice President or Senior Analysts who handed them down to members of the class." (Compl. ¶ 27.) Courts within the Second Circuit have found that the fact that some potential FLSA class members had super-visory responsibilities, while others did not, demonstrates that the potential plaintiffs are not "similarly situated." *Hendricks*, 263 F.R.D. at 84-85 ("The fact that some potential FLSA class members . . . had no supervisory responsibilities over other employees, while many spent signifi-cant amounts of time performing tasks such as hiring, interviewing, and reviewing work,

strongly bears on the court's conclusion that the members of the proposed class are not similarly situated.")[8]

## IV. Henderson Was Not Similarly Situated To Associates

At TTG, Associates were senior to Analysts. In the Complaint, Henderson alleges without support that "associates worked with Henderson performing the same work except at a different level of the process. They earned slightly more than Analysts but still made no relevant decisions on a daily basis" and that "all of the other Analysts and Associates worked the same hours yet never received additional compensation for their time." (Compl. ¶¶ 29, 39.)

Henderson, in contrast, testified that the responsibilities of an Associate, Seung Lee, differed from his own because she acted as a "point person" and "leader" in financial modeling:

> "She had been there for a while, so she knew kind of all the ins and outs. She was really the leader in getting stuff done like making the models, she was really the point person. So even though she wasn't the one who decided what things had to be done, like she would know where mistakes were, what things need more work. She really kind of took charge in that sense at least, everyone kind of relied on her." (Henderson Tr. 36:10-22.)

---

[8] Although Henderson does not rely on *Damassia* v. *Duane Reade, Inc.*, 04 Civ. 8819 (GEL), 2006 U.S. Dist. LEXIS 73090 (S.D.N.Y. Oct. 4, 2006) and the related case *Chowdhury* v. *Duane Reade, Inc.*, 06 Civ. 2295 (GEL), 2007 U.S. Dist. LEXIS 73853 (S.D.N.Y. Oct. 2, 2007), we note that those decisions are factually distinguishable from the current situation. In both cases, it was only after the ***defendants admitted*** that all of the relevant employees had the "same duties and responsibilities" that the court rejected the defendants' arguments that variances in their employees' day-to-day activities defeated the substantial similarity test. *See Chowdhury*, 2007 U.S. Dist. LEXIS 73853, at *14; *Damassia*, 2006 U.S. Dist. LEXIS 73090, at *14 ("Significantly, defendant has twice conceded to the Court that the business practices at issue in this case are uniform among its stores."). The court in *Chowdhury* explained that "defendants must show that plaintiffs are not similarly situated ***in ways relevant to their entitlement to overtime compensation under FLSA***." *Chowdhury*, 2007 U.S. Dist. LEXIS 73853, at *16 (additional emphasis added). Here, in contrast, Defendants have shown that Henderson's and the other Analysts' tasks differed such that the analysis under the Administrative Exemption for each differs materially.

That their salary, supervisory authority, duties, and application of financial knowledge in their tasks differed from Henderson's compels the conclusion that they could not have been "similarly situated." *Hendricks*, 263 F.R.D. at 84-86.

## V.  The Necessary Fact-Specific Inquiry Into Each Plaintiff's Duties Renders Collective Treatment Inappropriate

Central to Plaintiff's claims and Defendants' defenses is the question of whether Analysts and Associates at TTG qualified for FLSA's applicable exemptions, including the administrative or professional exemptions. Courts within the Second Circuit have found collective treatment inappropriate where employees' job descriptions and responsibilities varied such that individual factual inquiries would be necessary to determine exempt or non-exempt status. *See Diaz* v. *Electronics Boutique of America, Inc.*, No. 04 Civ. 0840E (SR), 2005 U.S. Dist. LEXIS 30382, at *14 (W.D.N.Y. Oct. 13, 2005) ("Although SMs share the same job description, their responsibilities, in fact, may differ and thus a highly fact-specific and detailed analysis of each SM's duties is required, making class treatment inappropriate.")

Similarly, in *Mike* v. *Safeco Insurance Co. of America*, "the central question in determining Safeco's liability will be whether the balance of tasks Mike performed on a day-to-day basis were administrative or non-administrative." 274 F. Supp. 2d 216, 220 (D. Conn. 2003). Because "[d]etermining whether an employee is exempt is extremely individual and fact-intensive, requiring 'a detailed analysis of the time spent performing administrative duties' and 'a careful factual analysis of the full range of the employee's job duties and responsibilities,'" the Court denied the plaintiff's motion for authorized notice, stating that "[t]he nature of Mike's claim necessarily precludes proceeding on a collective basis." *Id.* (quoting *Cooke* v. *General Dynamics Corp.*, 993 F. Supp. 56, 59-61 (D. Conn. 1997)); *see also Sexton* v. *Franklin First Financial, Ltd.*, No. 08-CV-04950 (JFB) (ARL), 2009 U.S. Dist. LEXIS 50526, *19 (E.D.N.Y.

June 19, 2009) (granting motion for condition certification, but where "this is **not** a case where 'a detailed factual analysis of [a plaintiff's] daily activities and responsibilities,' is required to make a determination of the plaintiff's exempt or nonexempt status. . . .") (emphasis added and internal citation omitted); *Evancho* v. *Sanofi-Aventis*, No. 07-2266 (MLC), 2007 U.S. Dist. LEXIS 93215, at *13 (D.N.J. Dec. 18, 2007) (denying preliminary certification because evidence indicated that employee responsibilities "may vary among plaintiffs and potential collective action members.")

**VI.    Defendants Will Succeed At Trial In Proving That The Employees Are Not Entitled to Overtime Compensation**

Collective treatment may also be inappropriate where a defendant shows that it "will likely succeed at trial in proving that the employees are not entitled under the FLSA to overtime compensation." *Amendola* v. *Bristol-Myers Squibb Co*., 558 F. Supp. 2d 459, 467 (S.D.N.Y. 2008). In such a case, "a court may refuse to authorize notice or postpone deciding the issue pending further discovery and motion practice." *Id*. In *Amendola*, the court "scrutinize[d] the merits based on the record developed to date by the parties and to the extent necessary to address this motion for authorization of notice." *Id*. at n.9. The court then denied the plaintiffs' motion for authorized notice because the employees at issue likely fell within FLSA's administrative exemption:

> "In sum, BMS has shown that all of its PRs qualify for the administrative exemption under the first prong of the pertinent regulation, and that it will likely succeed in proving that they operate with the discretion required by the second prong of the exemption. In light of this likelihood, notice of this lawsuit to BMS's thousands of PRs is not authorized. Such notice would not promote the fair and expeditious resolution of the claims raised in this action."

*Id*. at 477.

Here, as set forth in Defendants' Motion for Summary Judgment, TTG's Analysts qualified for the administrative exemption. TTG's Associates would thus also qualify, as they performed more advanced work and exercised additional leadership and judgment, such as identifying problems and parceling out tasks in response. (Henderson Tr. 36:10-22.)

In particular, FLSA's Regulations also give several examples of employees who qualify for the administrative exemption on *both* of the primary duty prongs, one of which is specific to employees in the financial services industry like the employees of TTG:

> "Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products."

29 C.F.R. § 541.203(b). This describes almost exactly the debt marketing and promotion and other analysis and deal work performed by Analysts at TTG.

## CONCLUSION

For the foregoing reasons, Henderson's motion should be denied.


Dated:    March 29, 2010
            New York, New York

Respectfully submitted,

CAHILL GORDON & REINDEL LLP


By:      /s/ David G. Januszewski
          David G. Januszewski
          Lauren Perlgut
80 Pine Street
New York, New York  10005
(212) 701-3000
DJanuszewski@Cahill.Com

*Attorneys for Defendants The Transportation Group, Ltd. and Joseph Steuert*