UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| THEODORE HENDERSON, on behalf of himself and those similarly situated, <br><br> Plaintiff, <br><br> - against - <br><br> THE TRANSPORTATION GROUP, LTD., and JOSEPH STEVERT, <br><br> Defendants. | Case No. 09 CIV 7328 (DLC) |

**DEFENDANTS' REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT**

CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Defendants The Transportation
Group, Ltd. and Joseph Steuert*

Of Counsel:

David G. Januszewski
Lauren Perlgut

## TABLE OF CONTENTS

Page

INTRODUCTION ..............................................................................................................1

ARGUMENT ....................................................................................................................2

    I.   The Majority of Henderson's Working Time Was Spent on Tasks Directly Related to TTG's General Business Operations..............................................................................2

    II.  Henderson Exercised Discretion and Independent Judgment......................................4

    III. Henderson's Response to Defendants' 56.1 Statement is Improper ............................8

CONCLUSION ................................................................................................................10

# TABLE OF AUTHORITIES

                                              Page

Cases

*Amendola* v. *Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459 (S.D.N.Y. June 4, 2008) ................................................................................................. 3, 5, 5n

*Davis* v. *J.P. Morgan Chase & Co.*, 587 F.3d 529 (2d Cir. 2009) ...................... 2

*In re Novartis Wage and Hour Litigation*, 593 F. Supp. 2d 637 (S.D.N.Y. 2009) ................................................................................................ 5, 5n, 6-7

*Reiseck* v. *Universal Communications of Miami, Inc.*, 591 F.3d 101 (2d Cir. 2010) ................................................................................................ 6

*Reiseck* v. *Universal Communications*, 06 Civ. 0777 (TPG), 2009 U.S. Dist. LEXIS 26013 (S.D.N.Y. Mar. 25, 2009) ............................................... 6

*Velez* v. *SES Operating Corp.*, 07 Civ. 10946 (DLC), 2009 U.S. Dist. LEXIS 106465 (S.D.N.Y. Nov. 12, 2009) ...................................................... 8

Regulations

Labor Regulations

    29 C.F.R. § 541.200 (2010) ....................................................................... 1, 2, 4
    29 C.F.R. § 541.201 (2010) ....................................................................... 2
    29 C.F.R. § 541.202 (2010) ....................................................................... 6
    29 C.F.R. § 541.700 (2010) ....................................................................... 4

Rules

Fed. R. Civ. P.

    56(b) .......................................................................................................... 1

Local Civ. R.

    56.1 ........................................................................................................... 1, 8

Defendants The Transportation Group, Ltd. and Joseph Steuert (collectively, "Defendants") respectfully submit this Reply Memorandum of Law in further support of their Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(b).

## **INTRODUCTION**

Plaintiff Theodore Henderson ("Henderson") concedes that he satisfies the salary basis requirement of the Fair Labor Standard Act's ("FLSA") administrative exemption, 29 C.F.R. § 541.200(a). (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Mem.") at 5.) He argues only that Defendants have failed to show that his primary duty was directly related to general business operations and that he exercised discretion and independent judgment in the performance of that duty. *See* 29 C.F.R. § 541.200(a).

The parties are in agreement over the material facts of Henderson's employment as a financial analyst at the boutique investment bank The Transportation Group (Capital) Limited ("TTG"). It is thus undisputed that in his position as a financial analyst Henderson worked within a team to complete assignments, and that as part of the marketing team he made marketing calls to potential investors. (*See* Plaintiff's Reply to Defendants' Rule 56.1 Statement ("Pl. Resp. to 56.1") ¶¶ 10, 13, 17.) The parties agree that in performing his marketing work, Henderson "wrote communications to clients, researched potential clients and could tailor his communication schedule as well." (Pl. Mem. at 12.) It is also undisputed that there was no written manual or guidelines on how to perform these marketing calls, requiring Henderson to himself assess the potential client relationship. (Pl. Resp. to 56.1 ¶ 33; Pl. Mem. at 1.)

Where Henderson claims that facts remain in dispute, he has either failed to provide admissible evidentiary support as required by Local Rule 56.1(d), or he focuses on immaterial details. Despite contending that Defendant "fail[ed] to consider the gravamen of the vast majority of authority on the matter," Henderson cites no additional controlling case law relating to the applicability of the administrative exemption. (Pl. Mem. at 2.)

**ARGUMENT**

I. **The Majority of Henderson's Working Time Was Spent on Tasks Directly Related to TTG's General Business Operations**

In order to qualify for the administrative exemption, an employee's "primary duty" must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). "An employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a).

In seeking to avoid application of the exemption, Henderson argues that (1) his cold calling duties were related to "production" rather than general business operations, and (2) his idle time spent reading the newspaper during a slow period triggered by the global financial crisis should count as Henderson's "primary duty." (Pl. Mem. at 8.) Defendants discuss each argument in turn.

Both parties rely on the Second Circuit decision in *Davis* v. *J.P. Morgan Chase & Co.*, for its guidance on distinguishing employees who "performed substantial and independent financial work" from those who "merely sold financial products," which could be considered the equivalent of production work. 587 F.3d 529, 533 (2d Cir. 2009). The court in *Davis* found the plaintiff underwriter non-exempt where he followed strict procedures outlined in a written manual to reach a yes-or-no decision, and was paid based on the quantity of successful loans closed per day. *Id*. at 534. The financial transactions structured by TTG differ significantly from the thousands of insurance policies sold in *Davis*, however. At TTG, a small group of employees worked as part of a team to close a deal, for which finding interested investors was just one part of a multi-step process, performed by all levels of employees. (Pl. Resp. to 56.1 ¶ 13; Kolber

Aff. ¶ 9[1]; Perlgut Decl. Ex. 9.) TTG had no instruction manual on how to do debt marketing—and indeed could not have — as each deal had varying financial structures reacting to the changing financial markets. (Kolber Aff. ¶ 15; Pl. Resp. to 56.1 ¶ 33.) For example, one transaction Henderson was asked to help market was a "$204.8 Million Secured Loan Facility for the Leveraged Purchase and Operating Leaseback of thirteen (13) KLM B737-300/400 aircraft and five (5) KLM B747-400 aircraft," which was structured to attract equity investors and senior lenders. (Perlgut Decl. Ex. 13.) The Secured Loan Facility issued at closing in two separate "pari-passu" tranches on a cross collateralized basis, an $137.51 million "fully amortizing tranche" and a $67.29 million "interest only 'bullet' tranche with a balloon payment," and variable terms. *Id.*

Henderson tries to distinguish *Amendola* v. *Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459 (S.D.N.Y. June 4, 2008), which held that the plaintiff pharmaceutical sales representatives likely qualified for the administrative exemption. Henderson points to that court's reasoning that the plaintiffs there represented their employer in meetings with medical providers where they promoted the employer's products and that the employer drug company's business depended in part on the success of the representatives in educating physicians about the underlying products. This same reasoning applies to TTG's Analysts, however, who were responsible first for reaching out to investors to try to initiate a transaction by discussing the proposed financial structure, and then participating in meetings and communications over the course of the deal's closing. (Kolber Aff. ¶¶ 10, 18.) Moreover, Financial Analysts at TTG did not make

---

[1] In connection with their Motion for Summary Judgment, Defendants have submitted the Declaration of Lauren Perlgut, dated March 22, 2010 [DKT 39] ("Perlgut Decl."); the Affidavit of Charles Kolber, Managing Director of TTG, dated Feb. 25. 2010 [DKT 33] ("Kolber Aff."); the Affidavit of Joseph J. Steuert, Chairman and CEO of TTG, dated March 1, 2010 [DKT 34] ("Steuert Aff."); and the Affidavit of Thomas Vanlangen, formerly a Vice-President at TTG, dated March 1, 2010 [DKT 35] ("Vanlangen Aff."). The transcript of the deposition of Henderson conducted on February 12, 2010 is attached as Exhibit 3 to the Perlgut Decl.

"sales" (or loans for that matter), but initiated conversations with investors to foster a relationship for current *and future* deals. (Steuert Aff. ¶ 8.)

As addressed in Defendants' moving brief, Henderson himself has described his job at TTG as "Pricing asset-backed loan schedules and structuring the acquisition or refinancing of commercial aircraft for the boutique investment bank. Automating generation of transaction models and marketing material using VBA. Performing debt marketing support." (Perlgut Decl. Ex. 7.) Now, remarkably, Henderson contends that his primary duty as TTG was to sit around reading the newspaper or trying to look busy. (Pl. Mem. at 8.) Henderson offers no authority for the proposition that his own idleness or inability to perform the job for which he was hired should determine application of the administrative exemption.[2]

Henderson testified that he spent more time performing marketing work than on any other *work-related task* and estimated that it constituted roughly half the time he spent on his actual duties. (Henderson Tr. 60:9-25.) FLSA's regulations state that in determining an employee's "primary duty," factors to consider include "the relative importance of the exempt duties *as compared with other types of duties*." 29 C.F.R. § 700(a). Henderson's marketing work should thus be considered his primary duty for both prongs of the administrative exemption.

## II. Henderson Exercised Discretion and Independent Judgment

In order to qualify for the administrative exemption, an employee's primary duty must also include "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). While no court within the Second Circuit has assessed the level of discretion used by investment bankers, courts within the Southern District of New York have considered the application of discretion to marketing and promotion work in the con-

---

[2] Henderson's newfound description of his job as idle newspaper reader and waster of time also demonstrates that he is not qualified to serve as a representative of all Analysts and Associates who worked at TTG over a six year period.

-4-

text of pharmaceutical sales representatives. These courts have found the requirement satisfied where the representatives chose how to present certain corporate information (the use of personalized communication techniques) and allocated these communications within their own schedules. *See Amendola*, 558 F. Supp. 2d 459 at 477; *In re Novartis Wage and Hour Litigation*, 593 F. Supp. 2d 637 (S.D.N.Y. 2009).[3] Henderson admits, similarly: "Defendants are correct that Plaintiff 'wrote communications to clients, researched potential clients and could tailor his own communication schedule as well.'" (Pl. Mem. at 12.)

Despite this concession, Henderson nonetheless argues that these cases should be distinguished because, as he alleges, (1) he was "constantly supervised," (2) he did not have supervisory authority to close a deal, or (3) he did not choose the "content" of his communications. (Pl. Mem. at 12-13.) These contentions are all unsupported and irrelevant.

First, Henderson has utterly failed to support his contention he was "constantly supervised," and does not —and indeed could not— include this assertion in his Rule 56.1 Statement. Plaintiff's Memorandum points to two excerpts of Henderson's deposition the contention. First, he cites pages 46-47 which relate only to the communications themselves and do not mention supervision at all. Second, he cites pages 89-90, with respect to which the only possibly relevant portion says: "every time that we mailed out our editions we would mail it to the whole team. When I did my checks I would give it to Tom [Vanlangen, Henderson's supervisor] to make sure that it was right." (*See* Pl. Mem. at 12-13.) The fact that Henderson actively sought

---

[3] As discussed in Defendants' opening brief, in *Amendola*, the court found it significant that: "PRs tailor the content of their presentations to each medical provider based on the provider's patient population, prescription practices, and other factors, and independently decide what promotional message will be most effective" and that they "strategically manage their call lists, exercising their own judgment in deciding how often to visit a doctor and whether to add new providers to their lists." 558 F. Supp. 2d 459 at 477. And in *Novartis*, "[w]ithin the confines of the 'core messages' created by [the defendant employer], Reps must decide how best to present their information and must determine what type of 'close' is most appropriate in a given situation. . . Reps set their daily call schedules and are expected to use their entertainment budgets to host informational events for the physicians on their target lists." 593 F. Supp. 2d at 657.

-5-

review for his work product in the first few weeks of employment does not amount to the "constant supervision" Henderson contends. Moreover, FLSA's regulations expressly provide that "the fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." 29 C.F.R. § 541.202(c). Henderson has not even responded to Defendants' additional argument that cases applying FLSA's exemptions have also considered some level of supervision within the first few months of one's employment as to be expected, and not inconsistent with an employee have discretion and independent judgment. *See, e.g., Reiseck* v. *Universal Communications*, 06 Civ. 0777, 2009 U.S. Dist. LEXIS 26013, at *15 (S.D.N.Y. Mar. 25, 2009) (Griesa, J.) (Plaintiff "exercised discretion and independent judgment, ***even though she was required to consult with [a supervisor] about these decisions during the first months of her employment*** with Universal.") (emphasis added), *rev'd on other grounds*, *Reiseck* v. *Universal Communications. of Miami, Inc.*, 591 F.3d 101 (2d Cir. 2010).

Moreover, the fact that Henderson did not have the "authority" to "close" a deal or set the "rate" or "terms" in his initial marketing calls, or otherwise, is irrelevant. (Pl. Mem. at 3, 11.) While these factors may be significant when considering employees selling discrete products to individual customers, they are inapplicable to investment banking, and to complex transactional work. The deal process at TTG was a complex process which could span several months and involved multiple third party negotiations. (Kolber Aff. ¶ 6.)

Henderson did exercise independent judgment and discretion in the pieces of the deal process in which he participated, primarily marketing work to attract investors to the deal. Despite Henderson's clear testimony that he developed his own sales pitch and "could wing the words and express personality," he persists in arguing that he did not use "personalized communication techniques," because he was instructed to market particular ongoing or potential deals. (Henderson Tr. 53:11-13, 64:21-25; Pl. Mem. at 11-13.) Such is the case for nearly all marketing and sales employees, however — they do not choose which products their employers sell, but rather how to promote them. The court explicitly recognized this distinction in *Novartis*, holding

that representatives exercised discretion and independent judgment by determining how to best present their information ***"within the confines of the 'core messages'"*** created by their employer. 593 F. Supp. 2d at 657. (emphasis added). Henderson's arguments that he was told what to say or how to say it are belied by his clear testimony that nobody with supervisory authority over him ever gave him a call script, at most he was either given bullet points (or approached an Associate to develop them) to capture the basic elements of the transaction. (Henderson Tr. 45:19-21; 54:15-19; 76:7-12; 86:12-16; Vanlangen Aff. ¶ 10.)

Part of the reason Henderson in his first weeks of employment may have needed bullet points outlining the terms of the financial transaction was that he was having difficulty understanding the transactions that TTG structured. After attending a "teach-in" designed to provide all the Analysts the proposed structure of the "Secured Loan Facility for the Leveraged Purchase and Operating Leaseback of thirteen (13) KLM B737-300/400 aircraft and five (5) KLM B747-400 aircraft" that they were expected to model and market, Henderson testified "it was kind of beyond me." (Perlgut Decl. Ex. 13, Henderson Tr. 31:10.) Henderson's claims that he did not perform work "which required a high degree of technical knowledge," (Pl. Mem. at 13), are thus belied by his own testimony and complaints that he did not receive "adequate" training to "gain the specialized knowledge," required for his *homework* assignments, which themselves were teaching him the basic concepts underlying the modeling work other Analysts performed. (Pl. Resp. to 56.1 ¶¶ 37, 42; Henderson Tr. 27:8-21).

Despite his inexperience, Henderson was assigned 85 debt marketing accounts and took active steps to locate additional potential investors. (Perlgut Decl. Ex. 9; Henderson Tr. 47:6-14, 64:21-25.) While Henderson concedes the latter point, (Pl. Mem. at 12), he disputes that he was the "primary contact" for any investors, and denies that he "was in charge of any accounts." (Pl. Mem. at 10-11; (Pl. Resp. to 56.1 ¶ 29.) These denials are wholly unsupported, *id.*, and moreover have no bearing on his exercise of discretion and independent judgment. While he may have needed assistance in his first few weeks, Henderson was expected to maintain relations with investors, and regularly communicate with his investor contacts. (Steuert Aff. ¶ 8.)

Even Henderson's own characterization that "when speaking with potential clients he merely *assessed* whether there was any potential for working with the company or not," reveals the crux of the marketing work Henderson performed: Henderson had to both try to persuade investors to learn more about TTG's investment opportunities while determining if the investor would be a good fit. (Pl. Mem. at 1 (emphasis added).)

**III.     Henderson's Response to Defendants' 56.1 Statement is Improper**

Local Rule 56.1(d) provides that "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, *must be followed by citation to evidence* which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." (emphasis added). This court recently found that where a party's opposition to a Rule 56.1 statement did not cite to contrary admissible evidence, the movant's uncontroverted statements were deemed admitted:

> "While defendant's Rule 56.1 statement includes record citations for each of its assertions of undisputed fact, the vast majority of plaintiff's objections fail to cite to contrary admissible evidence in the record. Plaintiff's Rule 56.1 statement thus fails to comply with Local Rule 56.1(d), which provides that each statement by the opponent 'controverting any statement of material fact [ ] must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).' As a result, those statements made by defendant that are not controverted by plaintiff's specific citations to the record are deemed admitted."

*Velez* v. *SES Operating Corp.*, 07 Civ. 10946 (DLC), 2009 U.S. Dist. LEXIS 106465, at *2-*3 (S.D.N.Y. Nov. 12, 2009).

As demonstrated by the examples in the table below, Henderson frequently fails to cite any evidence at all in denying Defendants' Rule 56.1(a) statements, or cites to evidence that does not contradict such statements:

| Defendants' Statement | Evidence Cited | Henderson's Response | Evidence Cited By Henderson |
|---|---|---|---|
| 3. "TTG also agreed to pay for the cost of the flight to London." | Perlgut Decl. Ex. 1: "TTG will purchase an air ticket between New York and London for your use in relation to the transfer." | "Deny that TTG agreed to pay for the cost of the flight to London." | None. |
| 5. "According to his | Perlgut Decl. Ex. 1: "Ef- | "Deny knowledge that | None. |

| | | | |
|---|---|---|---|
| Employment Contract, Mr. Henderson would become eligible for medical, life and disability insurance and participation in a 401(K) plan on May 1, 2009." | fective May 1, 2009, you will be eligible for the benefits offered to all TTG employees: medical, life and disability insurance participation in a 401(K) plan." | according to his Employment Contract, Mr. Henderson would become eligible for medical, life and disability insurance and participation in a 401(k) plan on May 1, 2009." | |
| 18. "Financial Analysts were responsible for maintaining relations with investors, both to market current deal proposals and to facilitate future deals." | Steuert Aff. ¶ 8: "Financial Analysts are also responsible for maintaining relations with investors, both to market current deal proposals and to facilitate future deals." | "Deny that Financial Analysts were responsible for maintaining investor relations and to market deal proposals and facilitate future deals. . ." | Henderson Dep p. 45: Discussing that debt marketing calls were made, and that on calls Henderson told investors about deals; Pak Aff. ¶ 4: ". . . Essentially, this was my job; filling in templates with the provided information." |
| 19. "Vice-Presidents, Associates and Financial Analysts all made phone calls or other communications to market the transactions they were working on." | *Inter-alia*, Kolber Aff. ¶ 9: "Vice-Presidents, Associates and Financial Analysts all make phone calls to market the transaction." | "Deny that Vice-Presidents made the same type of cold-calls that analysts made." | None. |
| 21. "Financial Analysts were expected to advise their teams how the proposals for new deals should be structured or current deals restructured to best capture the interest of these contacts based on these calls and communications." | *Inter alia*, Steuert Aff. ¶ 8: "Financial Analysts are expected to regularly communicate with their investor contacts such that they can advise how the proposals for new deals should be structured to best capture the interest of these contacts." | "Deny that Financial Analysts advised their teams about how the proposals for new deals should be structured or current deals restructured to best capture the interest of these contacts based on these calls and communications." | Pak Aff. ¶ 7: "In fact, I had no authority to make any independent decision on any matter affecting a significant part of the business. I was not allowed to exercise my own independent judgment in these situations." |
| 27. "Mr. Henderson's performance of debt marketing support consisted of contacting potential investors to learn more about their investment preferences and to market and discuss the deals his team was working to secure financing for." | *Inter alia*, Henderson Tr. 45:8-13: "[I]t would be cold call them and find out if they did these kind of deals, and then tell them about the deal based on the info that we were given." | "Deny that these calls included any discussion of deals secured by the Analysts." | Henderson Tr. 50-51: "I would say . . . that this is the thing that we were working on. . . . We would go through and say the terms, like it says here it's this long and has these loan margins. Other than that I couldn't get into specifics with them." |

| | | | |
|---|---|---|---|
| 29. "As of his fourth week of employment, Mr. Henderson was in charge of 85 debt accounts. . ." | *Inter alia*, Perlgut Decl. Ex. 9: "TH - number of debt accounts assigned to calling person: 85" | "Deny that Mr. Henderson was in charge of any accounts but admit he had 85 names to call." | None. |
| 31. "[H]e was free to, and indeed did, craft his own sales pitch in both written and oral communications to potential clients. | *Inter alia*, Henderson Tr. 53:11-13: "Now as you were making these phone calls did you develop a sales pitch? A. Yes, I assume so." | "Deny that Mr. Henderson had the authority to craft a sales pitch." | Henderson Tr. 53-54: only relevant portion is that Mr. Henderson did develop a sales pitch. |
| 34. "Mr. Henderson spent more time on debt marketing than any other task, and in total, roughly half of his time spent working was spent on debt marketing calls." | Henderson Tr. 60:9-25: "more than most things, other than reading the news and stuff. . ." Of time spent doing TTG work: "Probably somewhere under half, maybe half." | "Deny." | None |
| 42. Mr. Henderson had difficulty completing the more advanced training assignments. | *Inter alia*, Henderson Tr. 30:5-10: "Q. What were you taught at the teach-in? A. It was kind of beyond me at that stage." | "Deny. Mr. Henderson was given a homework assignment which he was unable to complete given that he did not receive adequate training." | Henderson Tr. 29: "I remember starting it, I don't remember finishing it though. I remember that we needed help on like all the parts." |

## **CONCLUSION**

For the foregoing additional reasons, judgment as a matter of law should be granted to Defendants with respect to all of Plaintiff's claims.

Dated: April 12, 2010
       New York, New York

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

By:    /s/ David G. Januszewski
       David G. Januszewski
       Lauren Perlgut
80 Pine Street
New York, New York 10005
(212) 701-3000
DJanuszewski@cahill.com

*Attorneys for Defendants The Transportation Group, Ltd. and Joseph Steuert*