UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
THEODORE HENDERSON, on behalf of        :
himself and those similarly situated,   :
                        Plaintiff,      :        09 Civ. 7328 (DLC)
                                        :
            -v-                         :        OPINION AND ORDER
                                        :
THE TRANSPORTATION GROUP, LTD, and      :
JOSEPH STEUERT,                         :
                        Defendants.     :
                                        :
----------------------------------------X

Appearances:
For the plaintiff:
Robert J. Valli, Jr.
Valli Kane & Vagnini LLP
600 Old Country Road, Suite 519
Garden City, New York 11530

For the defendants:
David G. Januszewski
Lauren Perlgut
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005

DENISE COTE, District Judge:

    This litigation raises the question of whether financial

analysts employed by a boutique investment bank are properly

classified as exempt from the overtime compensation rules

prescribed by the Fair Labor Standards Act, 29 U.S.C. §§ 201-219

("FLSA").  Plaintiff Theodore Henderson ("Henderson") has moved

for discovery of the names, addresses, and other identifying

information of analysts and associates, authorization for notice

of this collective action to be sent to those potential

plaintiffs, and an order requiring the defendants to post notice of this action in a place where employees are likely to view it. Following targeted, partial discovery, defendants The Transportation Group, Ltd. ("TTG") and Joseph Steuert ("Steuert") have moved for summary judgment.  The motion for summary judgment is denied and the request for authorization to send notice of the action is granted in part.

PROCEDURAL HISTORY

Henderson worked briefly at TTG as a financial analyst in the spring of 2009.  He filed his complaint on August 20 on behalf of himself and all those similarly situated.  An amended complaint was filed December 7.  The amended complaint alleges wage and hour violations under the FLSA.  It also seeks to maintain a class action pursuant to Fed. R. Civ. P. 23(b)(3) for violations of New York Labor Law, N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 12, § 142-2.2.

On December 10, in a conference with the Court, the parties agreed to engage in discovery regarding the applicability of the administrative exception under the FLSA, 29 U.S.C. § 213(a)(1), and New York Law, NYCRR tit. 12, § 142-2.14(c)(4),[1] specifically

---

[1] The parties agree that analysis of the exemptions at issue here under the FLSA and New York law is identical.  Therefore, the analysis in the Opinion refers to the FLSA, but applies to both claims.  See Reiseck v. Universal Commc'ns of Miami, Inc., 591 F.3d 101, 105 (2d Cir. 2010) (New York Labor Law "applies the same exemptions as the FLSA.").

whether an analyst's duties at TTG include the exercise of
discretion and independent judgment, see 29 C.F.R. § 541.200(a).
On December 16, the parties agreed to respond to a limited
number of interrogatories and document requests, and to conduct
one deposition each.  In February 2010, two individuals, James
Pak ("Pak") and Han Eol Cho, each filed with the Court a
"Consent to Join Collective Action."  On March 1, defendants
filed a motion for summary judgment.  The same day, Henderson
sought permission to send out Court-approved notice of a
collective action.  Both motions were fully submitted on April
12, 2010.

BACKGROUND

The following facts are undisputed, or, where disputed, are
taken in the light most favorable to Henderson.  TTG is a
boutique investment bank that provides "investment offerings,
investment research and arrangement and advisory services
related to the aviation and rail transportation industries."  In
February 2009, approximately six financial analysts worked in
TTG's New York office.  TTG did not pay its financial analysts
or associates overtime pay for hours worked in excess of forty
per week.

A.   TTG's Business

Each transaction in which TTG is involved is staffed by a
team consisting of financial analysts, associates, and vice

3

presidents; the teams complete assignments as a group.  The
analysts at TTG are divided into two teams that do essentially
the same work, although one team focuses more on marketing, and
the other more on pricing.  The steps that TTG takes in
connection with the deals it facilitates are:  identifying
companies that need to finance or refinance their equipment;
making a proposal tailored to the needs of those companies;
presenting the transaction to financing sources; when necessary,
restructuring the proposed pricing to respond to investor needs;
structuring a transaction and preparing the term sheets; and
documenting and closing the transaction.  In the course of
carrying out their duties, each team member participates in
activities such as conference calls with clients and internal
strategy meetings.

B.   The Role of Financial Analysts

     Shortly after they are hired, financial analysts are
trained by TTG in "financial concepts terminology" and the
fundamental principles of accounting and corporate credit
worthiness.  Inexperienced analysts complete "homework" to
practice these skills.  TTG does not have written guidelines or
manuals that dictate how to perform the job of analyst; analysts
learn through doing small portions of real assignments.

     The role of analysts is "to support" the efforts of the
entire team to complete the transaction.  All analysts perform

4

the same types of duties, although those duties vary based on
the individual analyst's experience.  The duties include (1)
making telephone calls and sending emails to prospective
investors in order to market transactions, (2) assisting in the
development of financial models using Microsoft Excel
spreadsheets, and (3) developing term sheets to finalize a deal.

All members of the team, including associates and vice
presidents, make the marketing telephone calls, the goal of
which is to inform potential investors of the terms of
commercial loans for aircraft.  TTG provides its analysts with
the terms of the loans that are being marketed and contact
information for potential investors.  In addition to telling
potential investors the terms of the deal that TTG is marketing,
the team members are "expected to synthesize the feedback heard
from investors" in order to discuss trends or insights that
could be addressed through changing the terms of the deal.
Analysts are also expected to maintain relationships with
investors to help in marketing current and future deals to them.[2]
If investors inquire about other investment opportunities, the
analysts are permitted to discuss alternative transactions if

---

[2] While Henderson has registered his disagreement in his Local
Rule 56.1 Statement with some of this description of the work
performed by financial analysts, he has not pointed to any
record evidence to create a disputed issue of fact.  The
defendants' evidentiary showing is, therefore, taken as
undisputed.

the analysts are aware of the terms of those other transactions. In some cases the marketing calls are preceded by a marketing email that outlines the terms of a proposed transaction. Analysts have some role in updating these emails with information relevant to the deal at issue or drafting portions of these emails.

With respect to lease pricing files, or models, an analyst is responsible for updating or working on portions of these Microsoft Excel spreadsheets based on his level of experience. Generally, the task involves "looking at a specific aircraft and trying to figure out a financing package, generating an appropriate model." A lease pricing file is a "sophisticated Excel spreadsheet consisting of workbooks that are linked together to provide a Summary Sheet that details the variables (input) that have been used to determined [sic] the proposed economics of the transaction." The parties dispute whether an understanding of finance is necessary to perform the calculations involved in creating the models, or if it involves merely "plugging in numbers" provided by management.

Finally, analysts play a role in preparing term sheets. The lenders, lessee, and equity investors all require a separate term sheet for each transaction. Analysts participate in telephone calls with these parties and then revise the term sheets to reflect changes decided upon in the calls.

C.   Henderson's Employment

Henderson, a 2007 college graduate, was hired by TTG on January 29, 2009 as an analyst at a salary of $35,000 per year. Henderson was laid off in late March or early April, 2009. Henderson was told that his employment was being terminated due to "lack of work."  Indeed, Henderson had very little work to do during his few weeks at TTG because business was so slow.  Prior to being laid off, however, Henderson had been spending, and was expected to spend, more than forty hours per week at work.

While working at TTG, Henderson made debt marketing telephone calls "more than most things;" it accounted for "maybe half" of the time he spent performing work for TTG.  In addition to calling the contacts on the TTG contact list, Henderson did internet research to find other investors in aircraft financing to add to the list.  On the calls, Henderson and other analysts would convey the loan terms and could otherwise "wing it" and choose their own words for the calls.  In the first three weeks of his employment, Henderson made seventy-four such telephone calls.

Henderson also helped draft the marketing emails. Additionally, he sent other emails to potential investors regarding transactions that Henderson had discussed with them on the telephone.  On one occasion, Henderson emailed Steuert to inform him that an investor with whom Henderson had spoken was

not interested in the transaction TTG was currently marketing, but that he was interested in a different type of transaction and would review materials for that type of deal.

DISCUSSION

A.   Authorization of Notice

Congress enacted the FLSA in 1938 "to protect all covered workers from substandard wages and oppressive working hours, [and] labor conditions that are detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers."  Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981) (citation omitted).  Among other protections, the FLSA requires employers to compensate employees at one and a half times their regular compensation for hours worked in excess of forty hours per week.  29 U.S.C. § 207(a)(1).

The FLSA permits one or more employees alleging violations of the FLSA to pursue an action in a representative capacity for "other employees similarly situated."  29 U.S.C. § 216(b).[3]

---

[3] Henderson has moved for "conditional certification" of this case as a collective action.  Neither the FLSA nor the Federal Rules of Civil Procedure provide for the certification of an FLSA collective action.  This Opinion will treat Henderson's motion as a request for authorization of notice and will not further refer to the motion as one for certification.  See Amendola v. Bristol-Myers Squibb Co., 558 F. Supp. 2d 459, 463 n.1 (S.D.N.Y. 2008).

Section 216(b) states, in relevant part, that an action to
recover damages under the FLSA:

> may be maintained against any employer . . .
> by any one or more employees for and on
> behalf of himself or themselves and other
> employees similarly situated.  No employee
> shall be a party plaintiff to any such
> action unless he gives his consent in
> writing to become such a party and such
> consent is filed in the court in which such
> action is brought.

Id.  Thus, to join an FLSA action an employee must file written
consent with the court, that is, "opt in."

District courts may set the conditions under which a
plaintiff gives notice to fellow employees of the existence of a
collective action and the steps they must take if they wish to
join the action.  Hoffman-La Roche Inc. v. Sperling, 493 U.S.
165, 169 (1989) (construing 29 U.S.C. § 216(b) in the context of
an ADEA lawsuit).  This authority derives from courts' inherent
power "to manage their own affairs so as to achieve the orderly
and expeditious disposition of cases."  Id. at 173 (citation
omitted).  "By monitoring preparation and distribution of the
notice, a court can ensure that it is timely, accurate, and
informative."  Id. at 172.

Ordinarily, a federal court authorizes notice of the
litigation to employees after making a preliminary determination
that the employees who will be receiving the notice are
similarly situated to the plaintiff.  See, e.g., Lynch v. United

9

_Servs. Auto Ass'n_, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007).  To obtain such authorization, a plaintiff must make only a "modest factual showing" that he and the other putative collective action members "were victims of a common policy or plan that violated the law."  _Realite v. Ark Restaurants Corp._, 7 F. Supp. 2d 303, 306 (S.D.N.Y. 1998) (collecting cases).  The standard may be satisfied by "substantial allegations of a factual nexus between named plaintiffs and potential opt-in plaintiffs with regard to their employer's alleged FLSA violation."  _Cohen v. Gerson Lehrman Group, Inc._, 686 F. Supp. 2d 317, 326 (S.D.N.Y. 2010).  Where a plaintiff fails to carry that burden or where a defendant employer shows that it will likely succeed at trial in showing that the employees to which the plaintiff desires to send notice are not entitled under the FLSA to overtime compensation, a court may refuse to authorize notice or postpone deciding the issue pending further discovery and motion practice.  _Amendola_, 550 F. Supp. 2d at 467.

B.   The Administrative Exemption

The defendants contend that Henderson has not shown that he is similarly situated to any TTG financial analyst who has suffered an injury under the FLSA because TTG's financial analysts are exempted as administrative employees from the FLSA's overtime payment provisions.  Any employee employed "in a bona fide executive, administrative, or professional capacity"

is exempted from the FLSA's minimum wage and maximum hour requirements.  29 U.S.C. § 213(a)(1).  There are three requirements for an employee to be classified as an administrative employee.  An "administrative" employee is one:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . .;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).  The parties agree that TTG analysts satisfy the first requirement but dispute whether the latter two requirements have been met.

Exemptions from the FLSA's requirements "are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit."  Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 531 (2d Cir. 2009) (quoting Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960)).  To prevail on their motion for summary judgment, defendants must demonstrate that there are no genuine issues of material fact with respect to whether financial analysts fulfill each of the two contested requirements.  Because the defendants have not shown an absence of a material factual dispute on the third

prong of 29 C.F.R. § 541.200(a), it will be unnecessary to discuss the second prong.

The requirements in the third prong of § 541.200(a) are the subject of explanatory regulations that are found in § 541.202. As explained there, "[i]n general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Determining whether an employee exercises discretion and independent judgment must be done "in the light of all the facts involved in the particular employment situation." Id. § 541.202(b). The regulations identify many factors to consider in making the determination, including:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; . . . .

Id. § 541.202(b) (emphasis supplied).  The regulations further explain that "[t]he exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision."  Id. § 541.202(c).  Employees' work may satisfy this requirement, however, "even if their decisions or recommendations are reviewed at a higher level."  Id.  Thus, the term "discretion and independent judgment"

> does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review.  The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action.  The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment.

Id.

Courts have considered additional factors, such as "an employee's discretion to set her schedule and to tailor communications to a client's individual needs."  Amendola, 558 F. Supp. 2d at 476 (citing Reich v. John Alden Life Ins. Co., 126 F.3d 1, 14 (1st Cir. 1997)).  But to qualify for the exception, "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-

established techniques, procedures or specific standards
described in manuals or other sources."  29 C.F.R. § 541.202(e).

C.   Summary Judgment on the Administrative Exemption

Summary judgment may not be granted unless all of the
submissions taken together "show that there is no genuine issue
as to any material fact and that the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The
moving party bears the burden of demonstrating the absence of a
material factual question, and in making this determination, the
court must view all facts "in the light most favorable" to the
nonmoving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986); Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).
"If the evidence submitted in support of the summary judgment
motion does not meet the movant's burden of production, then
summary judgment must be denied."  D.H. Blair & Co., Inc. v.
Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) (citation omitted).

Once the moving party has asserted facts showing that the
nonmovant's claims cannot be sustained, the opposing party must
"set out specific facts showing a genuine issue for trial," and
cannot rely solely on the pleadings.  Fed. R. Civ. P. 56(e);
Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  Only
disputes over material facts -- "facts that might affect the
outcome of the suit under the governing law" -- will properly
preclude the entry of summary judgment.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986); see also Roe v. City of
Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (quoting Anderson, 477
U.S. at 248).

Defendants have not shown that there is no material factual
dispute as to whether the primary duty of a TTG financial
analyst includes the exercise of discretion and independent
judgment with respect to matters of significance.  See 29 C.F.R.
§ 541.200(a)(3).  Before explaining why the defendants have
failed to carry that burden, an observation is in order.  In
this litigation, the parties are required to address the
applicability of the administrative exemption to the financial
analyst position at TTG, even though Henderson's tenure at TTG
was short and he never advanced beyond learning how to do the
most basic aspects of the analyst job.[4]

Defendants have provided only general descriptions of the
functions that analysts carry out.  For example, their evidence
explains that analysts "support the efforts of the completion of
the transaction" by carrying out three duties: making marketing
telephone calls, "assisting in the development" of the pricing

---

[4] In his approximately two months of work, Henderson attended a
few training sessions, attempted several homework assignments,
and was coached by an associate before making his first
marketing calls.  Nonetheless, it appears that Henderson was
taking part in the same tasks as fully-trained analysts, with
the exception of financial modeling.  The expectation was that
Henderson would also be doing that work after he completed his
training.

model spreadsheets, and creating term sheets.  The defendants
have not, however, submitted evidence describing the specific
tasks performed in providing that support and assistance and in
creating term sheets.  Similarly, with respect to financial
modeling, the defendants' witness opines that "[p]utting
together such a file is a sophisticated and dynamic process
changing frequently in reaction to market and investor demand."
But the witness does not describe, for example, what, if any,
alternatives, variables, or considerations must be weighed to
create or apply the model, how an analyst is expected to react
to "market and investor demand," or what authority analysts
possess to decide any matter of significance.  As a result, the
defendants are not entitled as a matter of law to a finding
regarding the discretion and independence exercised by financial
analysts.

The defendants make essentially four arguments for the
application of the administrative exemption to financial
analysts at TTG, but none of them change the conclusion that
summary judgment is inappropriate.  Defendants' attempt to place
the tasks they have described for analysts at TTG within the
guidance announced in the Department of Labor regulations
concerning discretion and independent judgment falls short.

1. § 541.202(b) Factors

First, the defendants argue that analysts carry out "major assignments in conducting the operations of the business" and perform "work that affects business operations to a substantial degree," two of the list of ten non-exhaustive factors that 29 C.F.R. § 541.202(b) enumerates for consideration.  While it is undisputed that the teams on which TTG's financial analysts work perform tasks that are essential to TTG's business, this is not sufficient to establish that the financial analysts exercise the discretion and independence that would qualify them for the administrative exemption.

2. Contact with Clients

The defendants also argue that the communications between TTG's financial analysts and clients in marketing telephone calls and emails demonstrates that analysts exercise independent judgment and have discretion.  The defendants point to Henderson's identification of new contacts to add to the contact list; the fact that an analyst can make debt marketing calls to his or her list of assigned contacts in any order that he or she chooses; and that the analysts are not given verbatim scripts for the calls.  These examples are insufficient, taken alone or together, to eliminate a question of fact regarding an analyst's independence and discretion.

The most independence that Henderson demonstrated was his internet research to identify potential investors.  But, defendants have not established that this was part of a financial analyst's assigned duties or that any analysts other than Henderson made additions to the contact list.  Moreover, they have not demonstrated that this task required discretion or judgment, rather than the mere recording of data or the application of a standard.  Id. § 541.202(e).

The defendants have emphasized analysts' discretion to call assigned contacts in whatever order they wish and to choose the exact phrasing by which to convey the terms of the loans they are marketing.  These opportunities do not represent the exercise of discretion on a matter "of significance."  See id. § 541.200(a)(3).  And although analysts have authority to discuss other transactions when an investor inquires, there has been no evidence that such conversations involve any decisionmaking or judgment, either.  Finally, defendants have not explained how analysts' discussion with their team members of the feedback they receive from potential investors requires the analysts to use discretion or judgment.

The defendants' rely on John Alden, Amendola, and In re Novartis Wage and Hour Litig., 593 F. Supp. 2d 637 (S.D.N.Y. 2009), in arguing that TTG's use of financial analysts as the primary contact with clients necessarily represents an

entitlement to the administrative exemption.  In each of those cases, however, the company's primary point of contact with clients had far greater latitude in framing proposals to customers.  For example, in John Alden, the marketing representatives could not only choose which agent to call on a given day, but could also decide what products to discuss with the agent and "tailor proposals for the agent's end customers." John Alden, 126 F.3d at 13.  The representatives had to "be able to anticipate the competing products that the agent's customers might be considering, and distinguish John Alden's offerings from those of competitors."  Id.  In Amendola, the pharmaceutical representatives "tailor[ed] the content of their presentations to each medical provider based on the provider's patient population, prescription practices, and other factors, and independently decide[d] what promotional message will be most effective," in addition to deciding whether or not to seek a "commitment" from the medical provider.  Amendola, 558 F. Supp. 2d at 477.  Those representatives also had discretion in how to spend their promotional budgets.  Id.  The jobs of the pharmaceutical representatives described in In re Novartis were similarly complex.  In re Novartis, 593 F. Supp. 2d at 657.

3. Technical Knowledge

The defendants next argue that analysts' possession of technical financial knowledge is evidence that they exercise

discretion and judgment.  To support this argument they point to two decisions, neither of which compels a decision in their favor.  Amendola held that pharmaceutical representatives qualified for the administrative exemption, but does not support the contention that technical knowledge alone is sufficient to demonstrate the exercise of discretion and judgment.  Amendola, 558 F. Supp. 2d at 474-75.  In Zalewski v. PNC Financial Servs. Group, 555 F. Supp. 2d 555, 564 (W.D. Pa. 2008), the magistrate judge recommended that the district court enter summary judgment for the defendant because the plaintiff's work as a senior financial analyst qualified the post for the administrative exemption.  Zalewski "adjusted allocation methodologies to ensure fairness," developed accuracy controls, performed analyses to be presented to upper management, trained others, identified flaws in company procedures, and revised company procedures.  Id. at 565.  Thus, the duties of the senior financial analyst in Zalewski were too dissimilar to those of financial analysts at TTG for Zalewski to provide guidance here.

    4. 29 C.F.R. § 541.203(b)

    Finally, the defendants contend that the FLSA regulation addressed to the financial services industry "almost exactly" describes the duties of TTG financial analysts and supports application of the administration exemption.  The recently enacted financial services regulation was intended to be

consistent with "existing case law" and "to clarify the
distinction between employees performing substantial and
independent financial work and employees who merely sold
financial products."  <u>Davis</u>, 587 F.3d at 533 (citation omitted).
It provides:

> <u>Employees in the financial services industry
> generally meet the duties requirements for
> the administrative exemption if their duties
> include work such as</u> collecting and
> analyzing information regarding the
> customer's income, assets, investments or
> debts; determining which financial products
> best meet the customer's needs and financial
> circumstances; advising the customer
> regarding the advantages and disadvantages
> of different financial products; and
> <u>marketing, servicing or promoting the
> employer's financial products</u>.  However, an
> employee whose primary duty is selling
> financial products does not qualify for the
> administrative exemption.

29 C.F.R. § 541.203(b) (emphasis supplied).

This regulation is of greater assistance in classifying
financial services industry jobs under the second prong of
§ 541.200(a), rather than the third prong, which is addressed to
the exercise of discretion and independent judgment.  In any
event, Henderson has raised a question of fact regarding the
opportunity for TTG financial analysts to exercise discretion
and judgment to the extent required to qualify that position for
the FLSA administrative exemption.

21

In sum, Henderson has shown that he is entitled to send notice of this collective action to current and former TTG employees who worked as financial analysts in New York between August 12, 2006, and the present.  Henderson has made no showing that he is similarly situated to an "associate" and therefore his request to send notice to TTG associates as well is denied. The contents of the notice, the scope of discovery to identify potential plaintiffs, and the request to post a notice in the TTG offices will be addressed in a conference with the parties.

### CONCLUSION

The defendants' March 1 motion for summary judgment is denied.   The plaintiff's March 1 motion for court-authorized notice is granted in part.

SO ORDERED.

Dated:     New York, New York
           July 1, 2010

_____
           DENISE COTE
United States District Judge